*Decisions will be entered under Rule 50.*

NAT HARRISON ASSOCIATES, INC., ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 91482, 567–62, 568–62, 949–62, 962–62. Filed June 23, 1964.

---

[1] Proceedings of the following petitioners are consolidated herewith: Nat G. Harrison, Jr., and Elaine Harrison, docket No. 567–62; Nat Harrison Associates, Inc., docket No. 568–62; Jan R. Smith and Mary Crum Smith, docket No. 949–62; and Alto Adams and Carra Adams, docket No. 962–62.

*Richard E. Thigpen* and *Richard E. Thigpen, Jr.*, for the petitioners.

*Kenneth G. Anderson*, for the respondent.

DRENNEN, *Judge:* In these consolidated proceedings respondent determined the following deficiencies in income tax:

| Docket No. | Petitioner | Taxable period | Deficiency |
|---|---|---|---|
| 91482 | Nat Harrison Associates, Inc | Apr. 1 to Sept. 30, 1957. | $189, 953. 97 |
| 568-62 | Nat Harrison Associates, Inc | FYESept.30,1958. | 156, 596. 93 |
| 567-62 | Nat G. Harrison, Jr., and Elaine Harrison | 1957 | 108, 455. 05 |
| | | 1958 | 225, 312. 63 |
| 949-62 | Jan R. Smith and Mary Crum Smith | 1957 | 39, 492. 02 |
| | | 1958 | 88, 853. 52 |
| 962-62 | Alto Adams and Carra Adams | 1957 | 24, 229. 91 |
| | | 1958 | 65, 643. 63 |

The issues for decision are:

■ Whether the net income from three contracts for construction of missile-tracking stations in the Caribbean was the income of, or can be allocated to, Nat G. Harrison, Jr. and Associates, an American partnership comprised of Nat G. Harrison, Jr., Jan R. Smith, and Alto Adams, and/or Nat Harrison Associates, Inc., an American corporation, organized to take over the partnership business, or was the income of Nat G. Harrison Overseas Corp., a Panamanian corporation owned and controlled by the above three individuals.

■ Whether petitioners Alto Adams and Carra Adams are entitled to a deduction in the year 1958 in the amount of $9,019.44 for interest paid the Prudential Insurance Co. of America (hereafter called Prudential); and

■ Whether petitioners Jan R. Smith and Mary Crum Smith are entitled to a deduction in the year 1957, under section 691(c), I.R.C. 1954,[2] for estate tax paid in respect of a decedent in an amount greater than the $4,638.14 allowed by respondent.

Other issues presented by the pleadings have been disposed of by agreement of the parties.

---

[2] All statutory references are to the Internal Revenue Code of 1954 unless otherwise noted.

GENERAL FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. For clarity the facts, other than those relating to the petitioners generally, with respect to each issue will be related separately, followed by the opinion relating to that issue.

Nat Harrison Associates, Inc., is a corporation organized under the laws of Florida. It filed Federal income tax returns for its fiscal years ending September 30, 1957 and 1958, with the district director of internal revenue, Jacksonville, Fla.

Nat G. Harrison, Jr. (hereafter referred to as Harrison), and Elaine Harrison are husband and wife residing in Miami, Fla. They filed joint Federal income tax returns for the calendar years 1957 and 1958 with the district director of internal revenue, Jacksonville, Fla.

Jan R. Smith (hereafter referred to as Smith) and Mary Crum Smith are husband and wife residing in Roswell, Ga. They filed joint Federal income tax returns for the calendar years 1957 and 1958 with the district director of internal revenue, Jacksonville, Fla.

Alto Adams (hereafter referred to as Adams) and Carra Adams are husband and wife residing in Fort Pierce, Fla. They filed joint Federal income tax returns for the calendar years 1957 and 1958 with the district director of internal revenue, Jacksonville, Fla.

Harrison and Smith both graduated from Georgia Institute of Technology with degrees in engineering, Harrison in 1939 and Smith in 1948. Except for periods of service in the Navy, both have been engaged in the contracting business in Florida or elsewhere since graduation.

Adams graduated from law school and was admitted to practice law in 1921, was appointed a justice of the Supreme Court of Florida in 1940, and served as chief justice for a term of 2 years. He resigned from the court in 1952 and has since been engaged in several businesses, including ranching, real estate, insurance, and construction.

Harrison is the son-in-law of Adams; neither is related to Smith.

*Issue 1. Contracting Income—All Dockets*

FINDINGS OF FACT

On or about April 1, 1955, Harrison, Smith, and Adams organized a partnership to engage in the contracting business under the name of Nat G. Harrison, Jr., and Associates (hereafter referred to as Associates) with offices in Miami, Fla. At first the partnership was conducted informally, and there was no written partnership agreement. However, under date of July 28, 1958, Harrison, Smith, and Adams executed an instrument termed a "Memorandum of Partnership Agreement" in which it was stated that the parties desired to set forth their oral understanding for the conduct of the partnership business which

had been conducted by the partners since April 1, 1955. It was agreed that partnership profits and losses had been, and would continue to be, shared as follows:

| Name: | Percentage |
|---|---|
| Harrison | 55 |
| Smith | 25 |
| Adams | 20 |

During the period under review, the distributive shares of the partners were as set forth above. Harrison was the managing partner. Smith's principal duties were making estimates and preparing bids and at times supervising jobs in the field.

It was further recited in the partnership agreement that at the close of business on March 31, 1957, certain assets and liabilities of the partnership, shown on a balance sheet attached to the agreement, had been transferred to a corporation, Nat Harrison Associates, Inc. (hereafter referred to as the domestic corporation), as paid-in surplus. It was stated that the partnership had an equity of $150,000 in these assets transferred to the corporation, and that after the transfer the capital accounts of the partners were as follows:

| | |
|---|---|
| Harrison | $59, 863. 97 |
| Smith | 11, 681. 86 |
| Adams | 25, 533. 47 |
| Total | 97, 079. 30 |

Adams knew little about the contracting business, but he owned real estate and his substantial net worth made it easier for Associates to obtain bonds for construction contracts. His primary interest in the business of the partnership was offering counsel and credit rating. He realized that the partners' individual liability on construction bonds, and for the obligations of the partnership generally, was broad and in the early part of 1957 he suggested that Associates be incorporated so that the partners could limit their liability to their investments.

The parties agreed to form a corporation, Nat Harrison Associates, Inc., and to transfer to it most of the business of the partnership, and it was intended that the corporation be activated as of April 1, 1957. However, financial statements of the partnership were not prepared by that date. On May 9, 1957, a certificate of incorporation for the domestic corporation, authorizing 2,000 shares of common stock of a par value of $10 each, was filed with the office of the secretary of state for the State of Florida. During the period here involved Harrison owned 55 percent, Smith 25 percent, and Adams 20 percent of the stock of the domestic corporation.

It was not until July 28, 1958, that Harrison and Adams, as directors of the domestic corporation, held a special meeting of the board of directors of the corporation to formally accept, on behalf of the corporation, a bill of sale for certain assets, subject to liabilities, which

had been the property of Associates on March 31, 1957. The balance sheet attached to the bill of sale listing these assets and liabilities was the same as that attached to the partnership agreement of July 28, 1958, and was as follows:

ASSETS

| | | |
|---|---:|---:|
| Cash | | $16, 262. 84 |
| Accounts receivable | | 466, 938. 28 |
| Advances to employees | | 6, 780. 50 |
| Expense advances | | 716. 91 |
| Prepaid expense and deposits | | 2, 522. 25 |
| Inventory of small tools and supplies | | 15, 006. 54 |
| Machinery and equipment (at cost) | $291, 862. 28 | |
| Less: Accumulated depreciation | 112, 401. 50 | |
| | | 179, 460. 78 |
| Total assets | | 687, 688. 10 |

LIABILITIES

| | | |
|---|---:|---:|
| Accounts payable—trade | | 75, 462. 71 |
| Notes payable—equipment contracts | | 7, 216. 99 |
| Accrued salaries and wages | | 15, 383. 26 |
| Accrued payroll taxes | | 10, 144. 72 |
| Loans payable | | 429, 480. 42 |
| Total liabilities | | 537, 688. 10 |
| Partners' equity transferred to Nat Harrison Associates, Inc.: | | |
| Harrison (55 percent) | $82, 500 | |
| Smith (25 percent) | 37, 500 | |
| Adams (20 percent) | 30, 000 | |
| Net equity transferred | | 150, 000. 00 |
| Total liabilities and partners' equity | | 687, 688. 10 |

The same balance sheet, headed "Schedule of Assets and Liabilities Transferred to Controlled Corporation as of Close of Business—March 31, 1957" was attached to the partnership information return for its fiscal year ending March 31, 1957, and to the domestic corporation's tax return for the period April 1 to September 30, 1957.

It was recited in the minutes of the special meeting of the board of the domestic corporation, that the foregoing assets, subject to liabilities, had been informally offered by the managing partner of Associates to the corporation on May 10, 1957, but that no formal action had been taken on the offer because the officers of the corporation, as well as the partners, understood "that in due course [the transfer] would be consummated as of April 1, 1957." It was further recited that the assets, subject to liabilities, had in fact been transferred to the domestic corporation as of April 1, 1957, and that the partners' net equity in the assets in the amount of $150,000 had been contributed as paid-in surplus by the stockholders in the same proportions as their respective stockholdings. The directors adopted a resolution approv-

ing and confirming the officers' action "in arranging for the transfer of assets, subject to liabilities, and the business operations in which such assets were employed," from the partnership to the corporation as of April 1, 1957.

All of the current business of Associates was transferred to the newly formed corporation except for one contract. The partnership was engaged in work in Guantanamo Bay, Cuba, in conjunction with Harada Corp. in which Harrison, Smith, and Adams were stockholders. Associates and Harada Corp. were performing the work under the construction contract as joint venturers, and Associates had assigned its interests under the contract to a Miami bank. The partners felt that because of this assignment the partnership should remain active in the joint venture until performance of the contract was completed.

In 1953, Harrison, Adams, and Smith traveled to the Panama Canal Zone at various times in connection with construction work done in that area, and they submitted bids for contracts for work to be done in the Canal Zone. They found that a competitor, a Panamanian corporation, was consistently submitting lower bids, and they attributed the competitor's ability to perform the work at lower cost and to win contract awards to the fact, among other things, that the competitor had lower labor costs. In their construction work in the United States they had agreements which required them to employ only union labor and they felt that employment of local nonunion labor on jobs outside the United States might be considered a violation of those agreements. They felt that a Panamanian corporation could perform construction work abroad by employing native, nonunion labor at low cost.

Also, they were aware that a Panamanian corporation would not be subject to U.S. tax on income earned outside this country and they understood that Panama imposed no tax on income of a Panamanian corporation which was earned outside that country.

While on a trip to Panama in 1953, Harrison and Adams retained a local law firm to organize a corporation under the laws of Panama. This corporation was Nat G. Harrison Overseas Corp. (hereafter called Overseas) the stockholders of which were Harrison, Smith, and Adams, whose stockholdings were in the same proportions as their interests in Associates. During the period here involved Overseas had no office for the active conduct of business in Panama but did retain the local law firm there at a yearly fee of $100. The office of Overseas in the Republic of Panama was shown to be the office of the retained attorneys. Overseas engaged in no activities until the latter part of 1956. Overseas opened a regular account and a payroll account at the First National Bank of Miami on or about November 15, 1956.

It was necessary for Harrison in his construction business to ob-

tain bid and performance bonds for construction contracts. He consistently dealt with John E. Hunt (hereafter called Hunt), an insurance agent, in obtaining these bonds. Hunt represented Continental Casualty Co. (hereafter called Continental). Because Associates had experience in the contracting business and because the partners, particularly Adams, had good credit standing, the partnership had no difficulty in obtaining bonds.

In late 1956, Harrison and Smith learned that the Navy, as a part of the crash program to close the missile gap, was to receive bids for contracts for construction work for missile-tracking stations on islands in the Caribbean. Smith obtained the plans and specifications for these projects and prepared estimates and bids. These estimates were reviewed by, and discussed with, Harrison and the accountant employed by Associates and the various companies in which Harrison was interested.

Smith and Harrison intended to submit bids on these projects in the name of Overseas, which they planned to have do the work if the contracts were obtained, but Hunt told Smith that Overseas could not obtain the necessary bonds because it had no credit rating and an inadequate financial statement. Because of the urgency to submit bids, Hunt, upon his own initiative, obtained bonds in the name of Associates as contractor, and when the bids were to be submitted Smith felt that they were required to be in the name of Associates since the bonds had been obtained for the partnership.

The bids were submitted to the Navy in the name of Associates, which was awarded the contracts, and the Government and Associates, as contractor, executed Navy contract NBy–4480 under date of December 21, 1956. This contract provided for construction of "Cine-Theodolite Tower Facilities and Power Plant Addition and Distribution for Air Force Missile Test Center, Off-Shore Facilities" at Grand Bahama Auxiliary Air Force Base, British West Indies, and required Associates to furnish a performance bond in the amount of the contract, $594,400, and a payment bond in the amount of $297,200. Under this contract the work was to be completed September 17, 1957.

Under date of December 10, 1956, the Government and Associates, as contractor, executed Navy contract NBy–8680 providing for the construction of minitrack antenna facilities at Mayaguana, Grand Turk, and Antigua Islands. Associates was required to furnish a performance bond in the amount of the contract, $172,500, and a payment bond in the sum of $86,250. Under this contract the work was to be completed at Mayaguana and Grand Turk Islands by April 14, 1957, and at Antigua Island by April 29, 1957.

Continental, as surety, issued the bid bonds and the bonds required under both contracts to Associates as principal.

Made a part of each Navy contract was a standard form prescribed

by the Navy, which provided that the contractor could assign claims for money due or to become due under the contract to a "bank, trust company or other financing institution." The contracts contained no provisions specifically permitting or denying the right to otherwise assign the contracts or subcontract the work called for in the contracts. Various provisions dealt with subcontractors, but the contractor, who was to receive payments, was entirely responsible for timely and satisfactory completion of the work and was either to give his personal superintendence to the work or to have an approved superintendent "on the work at all times during progress, with authority to act for him." The Navy looked solely to the contractor for proper performance under the contracts.

In January 1957 Harrison was advised that, as a part of the same missile program, Radio Corp. of America (hereafter called RCA) was to perform construction work for the Navy on Grand Bahama Islands. He visited the islands with a representative of RCA to view the site. He thought that Overseas could perform subcontracting work efficiently on RCA's project, and he sought a subcontract for Overseas. He applied for necessary bonds in the name of Overseas but found they could not be obtained. He then sought the RCA subcontract in the name of Associates. Under date of January 25, 1957, RCA, as contractor, and Associates, as subcontractor, executed a contract requiring Associates to perform certain construction work for radar facilities for RCA on Grand Bahama Island. The amount of the contract was $347,604, and Associates obtained a performance bond from Continental in this amount. Also, Associates obtained a payment bond in the amount of $173,802 in conformity with the contract. It was provided in the contract that Associates could not "assign, transfer, or sublet" its interest in the contract without prior consent of RCA. Payment was to be made to Associates which agreed that mechanics and laborers were to be paid at rates established by agreement between the United States and the United Kingdom pertaining to wages for island residents.

Associates, Overseas, the domestic corporation, and the other Harrison construction companies used a universal numbering system for all their projects and contracts. Under this system, the Navy contract NBy–4480 was designated job number 237; the Navy contract NBy–8680 was designated job number 247; and the RCA subcontract was designated job number 248. Hereafter these designations will be used to refer to the respective contracts.

When Associates was awarded the above contracts, Harrison told the comptroller for the Harrison companies, including Overseas, to set up accounts for Overseas for these jobs since Overseas was to perform the work. Such accounts were established on the books of Overseas.

The Navy made payments by check to Associates with respect to jobs 237 and 247 in the following amounts on the following approximate dates:

#### JOB 237

| Date: | Amount |
|---|---|
| Apr. 23, 1957 | $49, 473. 45 |
| June 4, 1957 | 57, 685. 50 |
| Sept. 9, 1957 | 47, 253. 04 |
| Sept. 25, 1957 | 91, 368. 78 |
| Feb. 6, 1958 | 45, 243. 76 |

#### JOB 247

| | Amount |
|---|---|
| Mar. 22, 1957 | 27, 211. 50 |
| Apr. 10, 1957 | 48, 741. 75 |
| May 27, 1957 | 185, 482. 80 |
| June 10, 1957 | 68, 921. 75 |
| July 3, 1957 | 19, 000. 00 |
| Sept. 11, 1957 | 209, 811. 29 |
| Sept. 11, 1957 | 12, 862. 14 |
| Sept. 19, 1957 | 63, 243. 40 |
| Dec. 18, 1957 | 27, 155. 50 |
| Mar. 28, 1958 | 23, 519. 33 |

RCA made payments by check to Associates with respect to job 248 in the following amounts on the following approximate dates.

| Date: | Amount |
|---|---|
| Mar. 14, 1957 | $99, 120. 62 |
| Apr. 9, 1957 | 64, 717. 18 |
| June 3, 1957 | 71, 357. 06 |
| June 25, 1957 | 58, 981. 23 |
| July 25, 1957 | 17, 345. 90 |
| Aug. 23, 1957 | 32, 534. 01 |
| Mar. 4, 1960 | 3, 048. 00 |

All of the above checks, representing all payments made by the Navy and by RCA under the three contracts, were endorsed by Associates and deposited to the credit of Overseas at the First National Bank of Miami, except that the check of March 4, 1960, in the amount of $3,048 was inadvertently deposited to the credit of the domestic corporation at this bank. Job 248 was completed in August 1957, but the check for $3,048, representing payment for a change order with respect to the subcontract, originally authorized by RCA by telegram, was not approved by the Navy until 1960.

The Navy prepared periodic estimates of the extent of completion on jobs 237 and 247 with Associates named as contractor and made progress payments, less retainages, to Associates based upon those estimates. Associates, in its own name, made periodic requests for payment from RCA on job 248 as work on that subcontract progressed. Change orders and extensions of time for completion of the three contracts were also negotiated and executed in the name of Associates and

final releases under all three contracts were issued by Associates. Under date of August 7, 1957, Associates filed an affidavit with RCA in connection with final payment on job 248 in which it was stated:

This is to certify that the reason there are no subcontractor releases or affidavits furnished in connection with the closing of the above-reference contract is that we did not use any subcontractors in performing this work.

At no time during the performance of the RCA contract did Associates request permission from RCA to assign or subcontract any of the work.

The work under these three contracts performed at the jobsites was performed in the name of Overseas. Overseas employed a superintendent or project manager to oversee the work and to deal with the field inspectors of the Navy and RCA. Most of the technicians employed on the jobs were employed from the United States but most of the common labor, as well as some of the carpenters, electricians, etc., were employed locally at the jobsites. Overseas maintained bank accounts, in the names of its superintendents, at the jobsites, from which it paid for miscellaneous items bought on the islands and the wages of the native labor which were paid in local currency. The superintendents submitted weekly reimbursement requests for funds to cover their expenditures. They were reimbursed by checks drawn on Overseas' bank account in Miami.

Each project involved the purchase of material and equipment which was obtained in the United States. From experience, Harrison and Smith had found it was difficult for a foreign corporation without credit standing to purchase materials in this country. Therefore, Associates or the domestic corporation purchased the necessary materials in their own names and had them delivered to Overseas at jobsites. Necessary invoices, bills of lading, and forms for sales tax, duty, and export clearance showed Overseas to be the recipient of the material and equipment. However, if the resident officer representing the Navy was required to approve the material, his approval was sought in the name of Associates. Associates paid the suppliers for the materials purchased and charged the amounts to Overseas on its books. These charges were usually paid by Overseas monthly. Overseas also reimbursed Associates for the cost of the bonds issued by Continental on the three contracts.

Overseas maintained an office, with a sign showing its name, in Antigua during the work on job 247. Overseas' employees dealt with local residents and merchants on the islands where the construction work was progressing, and they represented themselves to be employees of Overseas. Also, Overseas operated trucks with its name painted on them. Overseas leased, in its own name, a building on Antigua which served as an office and as lodging for skilled mechanics

who came from the United States to the island in connection with job 247. Overseas purchased celluloid buttons with the inscription "Nat G. Harrison Overseas Corporation" for its employees to wear. Correspondence regarding the contracts was addressed to Overseas directly at the sites or through a Navy fleet post office, New York, N.Y.

Overseas performed work on jobs 237, 247, and 248 with equipment owned by Associates or by the domestic corporation. Overseas also employed administrative facilities belonging to, and used the services of technicians employed by, Associates and the domestic corporation, for which it paid them amounts for equipment rental and for administrative and engineering services. No fixed or standard amounts were charged for equipment rental but the amounts charged were computed, usually semiannually, by the comptroller of the Harrison companies in conjunction with Harrison and Smith, based primarily on the value of the equipment and how long a particular piece of equipment would be in use, including the period for transportation. Such rental charges exceeded depreciation charges on the equipment. Charges for engineering and administrative services were arrived at in the same manner, based on employees' time spent on projects on which Overseas was working as shown by payroll records maintained for various contracts. In these charges, an amount was included for the overhead of the domestic corporation.

During the period under review, Overseas performed services under construction contracts other than jobs 237, 247, and 248, which it contracted for in its own name after arrangements had been made for it to obtain bonds under a joint venture agreement worked out with Continental as hereinafter mentioned. Overseas also used equipment and facilities owned by the domestic corporation on these jobs under similar rental arrangements. In the notices of deficiencies here involved respondent has not allocated any of the income or expenses from these other jobs to the domestic partnership or corporation.

On the books of Overseas for its fiscal year ended March 31, 1957, Associates was credited with $5,000 for equipment rental for jobs 237, 247, and 248. Associates was not credited with any amount for administrative or engineering charges on the books of Overseas for that period. On the books of Overseas for its fiscal year ended March 31, 1958, Associates was not credited with any amounts for equipment rental or service charges but the domestic corporation was credited with $41,700 for equipment rental and $73,900 for engineering and administrative services on all jobs being performed by Overseas during that fiscal year. For the period April 1 to September 30, 1957, and for the fiscal year ended September 30, 1958, the domestic corporation reported income received from affiliated companies for

equipment rental and administrative and engineering charges as follows:

|  | Equipment rental | Service charges |
|---|---|---|
| Sept. 30, 1957 | $42,714.18 | $31,900.00 |
| Sept. 30, 1958 | 123,538.61 | 87,521.79 |

The record does not disclose what portions of these amounts were received from Overseas.

Harrison, Smith, and Adams received no compensation directly from Overseas during the period under review, but respondent determined, and petitioners concede, that they received dividends from Overseas as follows:

Harrison:
    1957 .................................................. $5,500.00
    1958 .................................................. 8,259.98
Smith:
    1957 .................................................. 2,500.00
    1958 .................................................. 3,754.54
Adams:
    1957 .................................................. 2,000.00
    1958 .................................................. 3,003.63

Complete and separate sets of books and records were maintained for Overseas and for the domestic partnership and corporation. When the domestic corporation was formed to take over most of the business of the partnership, the remaining balances in the partners' capital accounts and the accounts remaining with the partnership were removed from the partnership books and records, which were then continued as the books and records of the domestic corporation. Transactions between the various companies were usually recorded daily and accounts between them were usually settled monthly by check.

In April 1957, Hunt was able to work out a joint venture agreement for the Harrison companies for purposes of bonding, under which Continental would issue bid and performance bonds to Overseas. Thereafter, several such bonds were issued in the name of Overseas in the year 1957. In 1958, a general indemnity agreement was executed by Continental and all the Harrison companies under which bid and performance bonds could be issued to any of the companies.

Associates reported its income on the basis of a fiscal year ending March 31 and by the completed-contract method of reporting income on long-term contracts, except that with respect to all contracts in progress which it transferred to the domestic corporation as of March 31, 1957, it reported its income on a percentage-of-completion basis as of that date. Associates reported no income from jobs 237, 247, and

248 in either of its fiscal years 1957 or 1958, and for its fiscal year ended March 31, 1958, the only operating income it reported was from the joint venture with Harada Corp. at Guantanamo Bay, Cuba, plus $217.09 income from a joint venture with Cleveland Electric Co. at Ramey Air Force Base, P.R.

The domestic corporation reported its income on the basis of a fiscal year ending September 30 and by the completed-contract method. On its tax return for the period April 1 to September 30, 1957, it reported income from equipment rentals and administrative and engineering charges to affiliated companies, as heretofore noted, and income from completed contracts in the net amount of $12,692.24. It reported no income from jobs 237, 247, and 248 but the above figure represents the net income from nine other jobs performed within the United States. On its tax return for fiscal 1958 it reported income from equipment rental and administrative and engineering services charged affiliates, as heretofore noted, and a loss from completed contracts in the net amount of $68,014.84. It reported no income from jobs 237, 247, and 248, but the above figure represents the net loss from 35 other jobs performed within the United States.

In its audit reports Overseas computed its income on the basis of a fiscal year ending March 31 and by the percentage-of-completion method of reporting income on long-term contracts. The only income reflected in its audit report for the period ended March 31, 1957, except for engineering and consultation fees of $23,500, was from the three contracts here involved, as follows:

| Job No.: | Percent complete, Mar. 31, 1957 | Net profit on jobs to date |
|---|---|---|
| 237 | 20.4 | $2,289.47 |
| 247 | 21.0 | 26,481.75 |
| 248 | 52.0 | 57,593.90 |
| Total | | 86,365.12 |

Overseas' audit report for its fiscal year ended March 31, 1958, reflects net income from these three contracts, in addition to net income of approximately $79,000 from five or more other contracts, as follows:

| Job No.: | Percent complete, Mar. 31, 1958 | Net profit on jobs |
|---|---|---|
| 237 | 100 | $61,643.17 |
| 247 | 100 | 275,431.77 |
| 248 | 100 | 114,586.28 |
| Total | | 451,661.22 |
| Less: Income earned prior to Apr. 1, 1957 | | 86,365.12 |
| Net income earned in year ended Mar. 31, 1958 | | 365,296.10 |

The balance sheets attached to Overseas' audit reports for its fiscal years 1957 and 1958 reflect the following:

### CURRENT ASSETS

|  | 1957 | 1958 |
|---|---|---|
| Cash in banks | $14,864.94 | $134,729.71 |
| Accounts receivable— | | |
|     U.S. Government | 193,388.22 | 208,206.64 |
|     RCA | 82,921.38 | 3,048.00 |
|     Harada Corp | 11,000.00 | 350,000.00 |
|     Compania Constructara | ---------- | 78.62 |
|     Officers and employees | ---------- | 35,010.00 |
| Expense advances | 1,668.95 | ---------- |
|     Total | 303,843.49 | 731,072.97 |

### CURRENT LIABILITIES

|  | 1957 | 1958 |
|---|---|---|
| Accounts payable— | | |
|     Trade | 66,764.36 | 41,416.79 |
|     Nat Harrison Associates, Inc. (partnership) | 89,395.63 | ---------- |
|     Nat Harrison Associates, Inc. (domestic corp.) | ---------- | 88,884.16 |
| Accrued expenses | 3,533.77 | 1,569.67 |
|     Total current liabilities | 159,693.76 | 131,870.52 |

### STOCKHOLDERS' EQUITY

|  | 1957 | 1958 |
|---|---|---|
| Capital stock | 10,000.00 | 10,000.00 |
| Retained earnings—prior periods | 24,284.61 | 134,149.73 |
| Retained earnings—current period | [1] 109,865.12 | [2] 455,052.62 |
|     Total stockholders' equity | 144,149.73 | 599,202.35 |
|     Total liabilities and stockholders' equity | 303,843.49 | 731,072.97 |

[1] Retained earnings for the current period (fiscal year ended Mar. 31, 1957) included only net income earned to date on jobs 237, 247, and 248, plus income from engineering and consultation fees in the amount of $23,500. Net income from contracts was computed by the percentage-of-completion method.

[2] Retained earnings for the period ended Mar. 31, 1958, included net income earned during the period from jobs 237, 247, and 248 (which were shown on the books of Overseas as 100 percent completed at Mar. 31, 1958), as well as from contracts designated jobs 251, 259, 260, 263, and 279 (which were undertaken during the fiscal period).

Job 237 was completed on or about February 6, 1958; it was 84.5 percent completed at September 30, 1957. Job 247 was completed on or about March 27, 1958; it was approximately 92.5 percent completed at September 30, 1957. Job 248 was completed on or about August 23, 1957.

In his notices of deficiencies herein, respondent accepted the figures of the Harrison companies with respect to the net profit on, and the percentage of completion of, the three contracts here involved, determining that the total net profit on all three contracts was $451,661.22, $86,365.12 of which had been earned as of March 31, 1957. However, respondent determined that the entire profit on these three contracts, job numbers 237, 247, and 248, was attributable to the partnership,

Associates, and thus taxable to the individual partners, and/or was taxable to the domestic corporation, Nat Harrison Associates, Inc. Because of the uncertainties with respect to the activation of the domestic corporation, the different fiscal years of the domestic corporation and the partnership, the fact that both the partnership and the domestic corporation computed income on long-term contracts on the completed-contract method but when the partnership ostensibly transferred most of its business to the domestic corporation on March 31, 1957, it computed its income on contracts then in progress on the percentage-of-completion method, and for other reasons, and in order to protect the revenue, respondent made alternative determinations with respect to the various taxpayers, which admittedly attributed a total of considerably more than the total net income from these three contracts to the various taxpayers during the years involved.

In his notices of deficiencies herein respondent allocated to the three individual taxpayers, as partners of Associates, a total of $86,365.12 income from these contracts for their calendar years 1957 (within which the fiscal year 1957 of the partnership ended), and also a total of $451,661.22 income from these contracts for their calendar years 1958 (within which the fiscal year 1958 of the partnership, during which all three contracts were completed, ended). Respondent has also allocated $365,296.10 of the net income from these three contracts to the domestic corporation for its short fiscal year starting April 1 and ending September 30, 1957, and $308,303.72 to the domestic corporation for its fiscal year ending September 30, 1958. At the opening of the trial, counsel for respondent made it clear that these allocations were in the alternative and that the net profit from these three contracts was intended to be taxed only once.

Respondent gave no reason or basis for his allocation of the net income from these three contracts to the various taxpayers here involved in his notices of deficiencies or in his pleadings, except to determine that the income of the partnership and/or the domestic corporation from contracts was increased by specified amounts. Nor did he mention any specific sections of the Code upon which he relied.

### ULTIMATE FINDINGS

Overseas, a corporation duly organized and existing under the laws of Panama during the period under review, performed the major part of jobs 237, 247, and 248, and earned the major portion of the net profits from these contracts. However, Associates was and remained the prime contractor under the two Navy contracts and the principal subcontractor under the RCA contract and was responsible for completion of the jobs, and it and the domestic corporation supplied necessary equipment, technical personnel, offices, and manage-

ment and administrative services that contributed to the timely and profitable completion of the contracts.

Neither Associates nor the domestic corporation would have entered into these three contracts and then assigned or subcontracted the work thereunder to Overseas and permitted Overseas to retain the entire net profits thereunder while Associates remained fully liable and responsible for completion of the contracts, unless Associates received compensation considerably in excess of the fees it charged Overseas for equipment rental and engineering and administrative services, except for the fact that Overseas, Associates, and the domestic corporation were all owned and controlled by the same individuals; nor would Associates and the domestic corporation have performed all the services they performed under these contracts for the charges made to Overseas except for the same reason. Had the parties been unrelated, Associates and the domestic corporation would have demanded and received a reasonable fee or a percentage of the net profits in exchange for the services rendered and the assigning or subcontracting of the work to be performed. A reasonable fee or share for Associates and the domestic corporation is 25 percent of the entire net profits on the three contracts in addition to the amounts charged Overseas for equipment rental and services.

Respondent's allocation of all the net profits on these three contracts to Associates and/or the domestic corporation was unreasonable.

Associates transferred its business, except for its liability under the subject contracts and its interest in the joint venture with Harada Corp., to the domestic corporation as of April 1, 1957.

In order to prevent the evasion of U.S. income tax and in order to correctly reflect the income of Overseas, Associates, and the domestic corporation, 25 percent of the net profits, which totaled $451,661.22, from jobs 237, 247, and 248 must be allocated to Associates and to the domestic corporation. The entire 25 percent should be allocated to Associates through March 31, 1957; thereafter 15 percent should be allocated to Associates, as prime contractor, for services performed and responsibilities assumed and the remaining 10 percent allocated to the domestic corporation. The net profits on the three contracts through March 31, 1957, were $86,365.12; and the net profits from April 1, 1957, to March 31, 1958, were $365,296.10.[3]

---

[3] As a guide to the parties in their Rule 50 computations but not as a finding of fact, our computation of the allocation of net profits on these contracts under the findings above indicate the following:

Net profits to be allocated to Associates in its fiscal year ended Mar. 31, 1957 _____ $21, 591. 28

Net profits to be allocated to Associates for its fiscal year ended Mar. 31, 1958_____ 36, 529. 61

Net profits to be allocated to domestic corporation for its fiscal year ended Sept. 30, 1957_____ 8, 548. 86

Net profits to be allocated to domestic corporation for its fiscal year ended Sept. 30, 1958_____ 46, 245. 56

OPINION

Respondent determined that the net profits on the two Navy and one RCA construction contracts performed in the name of Overseas, jobs 237, 247, and 248, were taxable to Associates, or in the alternative to Associates up to March 31, 1957, and thereafter to the domestic corporation. In his opening statement and in his brief, counsel for respondent contends primarily that Associates and/or the domestic corporation earned the income and controlled the contracts which produced the income and are therefore taxable on the income under section 61, and also that he has the right to allocate the income to Associates and/or the domestic corporation under section 482. While respondent did not mention his reliance on section 482 in either the notices of deficiencies or his pleadings, it is obvious that petitioners were not taken by surprise by this contention and, while such pleading hardly complies with the spirit of the rules of pleading of this Court, we think respondent may rely on section 482 in this case without amending his pleadings. Cf. *Commissioner* v. *Chelsea Products*, 197 F. 2d 620 (C.A. 3, 1952), affirming 16 T.C. 840 (1951); *Arthur Sorin*, 29 T.C. 959 (1958), affirmed per curiam 271 F. 2d 741 (C.A. 2, 1959). Petitioner does not contend to the contrary.

Petitioner does contend, however, that respondent's various determinations with respect to the various taxpayers, which admittedly would subject to tax considerably more income than the total net profits from the three jobs, are thereby shown to be conflicting, arbitrary, and unreasonable and hence are not entitled to any presumption of correctness, relying primarily on *Helvering* v. *Taylor*, 293 U.S. 507 (1935). In his opening statement counsel for respondent made it clear that the determinations were in the alternative and that respondent did not contend that the net profit from the contracts should be taxed more than once. Occasions often arise where, in order to protect the revenue, respondent must make alternative determinations which have the effect of taxing income more than once. We do not think respondent's alternative determinations under the circumstances here present were arbitary, capricious, or unreasonable. See *Malat* v. *Commissioner*, 302 F. 2d 700 (C.A. 9, 1962), affirming 34 T.C. 365 (1960), certiorari denied 371 U.S. 934 (1962), and *Revell, Inc.* v. *Riddell*, 273 F. 2d 649 (C.A. 9, 1959). Consequently, the presumption that respondent's determinations are correct would not be lost for that reason alone. However, we have found that respondent's taxation of all the net profit from these three contracts to the domestic entities, either under section 61 or under section 482, was unreasonable. We therefore must determine the proper allocation of the net profits among the various Harrison companies without the benefit of any presumptions. We have recently held that this Court may allocate

income under the statute in a manner the evidence before us demonstrates to be correct and that respondent's allocation need not be approved or disapproved *in toto*. *Pauline W. Ach*, 42 T.C. 114 (1964).

Petitioner contends that Overseas is a separate corporate entity organized and operating under the laws of Panama for a bona fide business purpose, that prior to the commencement of any work on jobs 237, 247, and 248, Associates transferred and assigned to Overseas the duty of performing the contracts and the right to receive the profits therefrom, that Overseas performed the work under the contracts and earned the profits therefrom, and that no part of those profits may be allocated or attributed to the domestic entities.

It is clear from the evidence that Overseas was a valid legal entity, separate from the domestic partnership and corporation, and that it was operated for a valid business purpose. Respondent tacitly admits this by not attempting to allocate the income from other contracts performed by Overseas to the domestic entities and by determining that the three stockholders of Overseas received dividends from it during the years here involved. Harrison testified that he and the other owners of the Harrison businesses decided that Overseas would conduct the business activities outside the United States and that the domestic corporation would conduct the business activities within the United States. This was a natural division of the business. The evidence also shows that Overseas has continued in business from the date it became active up to the date of the trial. Whether the primary reason for its existence and conduct of business was to avoid U.S. taxes or to permit more economical performance of contracts through use of native labor, or a combination of these and other reasons, makes no difference in this regard. Any one of these reasons would constitute a valid business purpose for its existence and conduct of business as long as it actually conducted business. *Moline Properties* v. *Commissioner*, 319 U.S. 436 (1943) ; *Estate of Julius I. Byrne*, 16 T.C. 1234 (1951) ; *John F. Nutt*, 39 T.C. 231 (1962), on appeal (C.A. 9, July 11, 1963). Overseas was not a sham.

We have also concluded from all the evidence that Overseas actually performed the construction work at the jobsites under these contracts. Without going into a detailed discussion of the evidence, it is apparent that the activities at the jobsites were conducted in the name of Overseas, the local labor was employed and paid by Overseas, technicians brought in from the United States were at least paid by Overseas, shipments of material and supplies were consigned to Overseas, Overseas leased housing facilities on the islands for its personnel, most of the correspondence with reference to these jobs directly to and from the jobsites was addressed to and sent out in the name of Overseas, and the expenses of the jobs were paid from Overseas' bank accounts

in Miami. The fact that some personnel previously used by Associates were employed on these jobs is not of great moment. The evidence is that they were paid by Overseas while working on these jobs.

Respondent argues that Associates was the prime contractor on each of these contracts, that there was no formal assignment or subcontracting of the work to Overseas, and in fact the.work could not be subcontracted or assigned without the consent of the Navy or RCA, that Associates not only made the estimates, submitted the bids, and put up the bonds on these contracts, but also purchased materials for the jobs, negotiated change orders on the contracts, and remained primarily liable on the contracts; consequently Associates earned the income and is taxable thereon.

We cannot agree with respondent that the work under the two Navy contracts could not be assigned or subcontracted. The contracts themselves contained no provisions specifically prohibiting it, and certainly some of the provisions in the contracts relating to subcontractors anticipated that some of the work might be subcontracted. We think respondent's reliance on 31 U.S.C. sec. 203 and 41 U.S.C. sec. 15 is misplaced. The first statute deals with an assignment of claims and has no application here. Nor do we think 41 U.S.C. sec. 15 should vary the conclusion reached here, so long as Associates remained primarily liable on the contracts. See *Hobbs* v. *McLean*, 117 U.S. 567 (1886) ; *McPhail* v. *United States*, 181 F. Supp. 251 (Ct. Cl. 1960). The latter statute provides for annulment of the contract if a contract is transferred to another party. These contracts were performed and paid for in full. The same observation may be made with respect to the RCA contract. While this contract contained a proviso against assignment or subcontracting without RCA's consent, this would not prevent Associates from actually having the work performed by someone else as long as Associates remained liable for it. This is what did happen; RCA did not object and paid the contract price. We are here concerned with who earned the profit arising out of the contract and who is taxable thereon.

It is true that Associates initially obtained and paid the premiums on the bonds required under the contract, purchased materials for the jobs, and supplied administrative facilities and administrative and engineering services. But the evidence indicates that Overseas reimbursed Associates for the bond premiums and the purchase price of the materials, and also paid Associates and the domestic corporation for equipment rental and administrative and engineering services rendered. Respondent does not attack the adequacy of the latter amounts. We do not think the performance of such services as mentioned above, for which there was good reason for Associates rather than Overseas to perform, in and of itself means that Overseas did not earn at least a

part of the profit on these jobs and is entitled thereto. Nevertheless we do think it is apparent that Associates and the domestic corporation did assume risks and performed services for which they were not compensated, and that had Associates been dealing with an unrelated party when it assigned this work to Overseas, it would have demanded and received compensation in some form over and above the charges it made for equipment rental and administrative and engineering services, which could probably best be measured by a percentage of the profits. Under such circumstances respondent would have been justified in attributing a part of the profits on these contracts to Associates and the domestic corporation. However, we do not think it was reasonable or necessary to properly reflect the income of Associates and the domestic corporation, for respondent to attribute or allocate the entire net profits to the domestic entities, in the light of the fact that Overseas performed a major part of the work in completing the contracts.

Respondent also argues that Associates, as the prime contractor, had control of the flow of income and complete discretion over the disposition thereof and therefore is the entity to which the income should be taxed, citing *Lucas* v. *Earl*, 281 U.S. 111 (1930) ; *Helvering* v. *Horst*, 311 U.S. 112 (1940) ; *Harrison* v. *Schaffner*, 312 U.S. 579 (1941) ; *J. E. Vincent*, 19 T.C. 501 (1952), affirmed in part and reversed in part sub nom. *Commissioner* v. *Gregory Run Coal Co.*, 212 F. 2d 52 (C.A. 4, 1954), certiorari denied 348 U.S. 828 (1954) ; *Essex Construction Co.*, 12 T.C. 1212 (1949), and similar cases. In each of those cases the Court found that the assignor of the income had either actually performed the work and earned the income or owned the property which produced the income. While Associates remained the prime contractor here, the contracts themselves did not produce the income—it was the work performed that did so. Compare *Commissioner* v. *Montgomery*, 144 F. 2d 313 (C.A. 5, 1944), affirming 1 T.C. 1000 (1943). Those cases are not apposite here. And we have held that a taxpayer's right to designate the party to earn income does not constitute such control over the income that it should be imputed to him, and that the designation does not constitute the anticipatory assignment of income. *Robert P. Crowley*, 34 T.C. 333 (1960).

We conclude that Associates was not the taxpayer under section 61 with respect to *all* the net profits earned under these contracts.

Respondent also relies on section 482 [4] of the Code as authority to

---

[4] SEC. 482. ALLOCATION OF INCOME AND DEDUCTIONS AMONG TAXPAYERS.

In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.

allocate the net profits from the three contracts to the domestic companies. That section authorizes the Commissioner to distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among organizations owned or controlled by the same interests if he determines that such is necessary in order to prevent evasion of taxes or clearly to reflect the income of the organizations. This Court has held recently that in certain instances the Commissioner may allocate net income under section 482 as a logical shortcut to allocating gross income and deductions. *Ballentine Motor Co.*, 39 T.C. 348 (1962), affd. 321 F. 2d 796 (C.A. 4, 1963). See also *Hamburgers York Road, Inc.*, 41 T.C. 821 (1964). We think that rule is applicable in this instance.

One of the principal reasons for the enactment of section 482 and its predecessors was to prevent the evasion of taxes by shifting income from a domestic business to a foreign corporation controlled by the same interests. *Asiatic Petroleum Co. (Delaware) Ltd.*, 31 B.T.A. 1152 (1935), affd. 79 F. 2d 234 (C.A. 2, 1935), certiorari denied 296 U.S. 645 (1935); *Jesse E. Hall, Sr.*, 32 T.C. 390 (1959), affd. 294 F. 2d 82 (C.A. 5, 1961). Here there can be little doubt that one of the reasons for having Overseas do the work and take the profit from these three contracts and other offshore contracts was to avoid payment of U.S. taxes on the income. Furthermore a comparison of the net profits of Overseas with the net profits of the domestic companies indicates the domestic companies may have been bearing more than their share of the expenses of the overall business done by the Harrison companies. The charges made against Overseas for equipment rental and services were purely arbitrary, being determined from time to time by the officers of the various companies with no fixed standard to rely upon. This is clearly a situation where the Commissioner was authorized to use section 482 to allocate a part of the profit on these contracts to the domestic companies to clearly reflect their incomes and to prevent evasion of taxes thereon.

Where the Commissioner applies section 482 the burden is usually on the taxpayer to show that the Commissioner's reallocation was unreasonable, arbitrary, or capricious. *Hall* v. *Commissioner*, 294 F. 2d 82 (C.A. 5, 1961), affirming 32 T.C. 390 (1959); *Grenada Industries* v. *Commissioner*, 202 F. 2d 873 (C.A. 5, 1953), affirming 17 T.C. 231 (1951), certiorari denied 346 U.S. 819 (1953). We think petitioners have carried their burden of showing that the allocation of *all* the net profits from these contracts to the domestic companies was unreasonable, because we have found that Overseas was a viable entity and performed most of the work on these projects. An uncontrolled corporation dealing at arm's length with Associates would not have performed the work on these projects for nothing. On the other hand

we do not think Associates, had it been dealing at arm's length with an unrelated corporation, would have assumed the liability under these contracts and performed the services it and the domestic corporation did without either a fixed fee or a share of the profits. The question is what share of the profits would it have demanded and received if it had been dealing with a stranger.

There is little evidence in this record upon which we can determine what a reasonable allocation of the profits would be. However we must do the best we can with what we have. *Helvering* v. *Taylor*, *supra*. Petitioner claims that the fees charged Overseas for equipment rental and services included a charge for overhead and produced a profit for the domestic companies. But there is no evidence that Associates was paid anything for assuming the risks under these contracts, or for transferring the right to the profits to Overseas, or for purchasing materials for the jobs, or for negotiating change orders, or for administrative facilities supplied. In addition, Overseas' use of the equipment and personnel of the domestic companies also prevented them from utilizing the equipment and personnel to make a profit for themselves.

Using our best judgment based on the record, we have concluded that a reasonable allocation of the net profits on these three contracts would be 25 percent to the domestic companies, over and above the amounts they actually charged Overseas for equipment rental and services, and 75 percent to Overseas.

While it would appear that the partners were dilatory in having the paperwork done in incorporating their business and transferring the business from the partnership to the corporation,[5] we are convinced that it was intended that the corporation take over all the business of the partnership except the joint venture with Harada Corp. as of April 1, 1957, and that in fact it did so. However, Associates continued to be the prime contractor under the Navy contracts and the responsible subcontractor under the RCA contract and was entitled to a share of the net profits under those contracts even after the rest of its business and assets were transferred to the corporation. Our best judgment is that the entire 25 percent of the net profits on the three contracts which is to be allocated or attributed to the domestic companies should be allocated to Associates up to April 1, 1957, and that thereafter 15 percent of the net profits should be allocated to Associates and the remaining 10 percent should be allocated to the domestic corporation. Inasmuch as both of these companies computed their income on the completed-contract method, their share of the profits on these three contracts will be included in their income for the years in which the contracts were completed, except that

[5] Neither was the formal partnership agreement executed until July 28, 1958, but there is no question of its existence prior to that time.

Associates' share of the profits, computed on the percentage-of-completion method as of March 31, 1957, shall be included in its income for its fiscal year ended March 31, 1957, and deducted from the amounts that would otherwise be included in the income of the partnership and the domestic corporation in the subsequent year or years. Compare *Palmer* v. *Commissioner*, 267 F. 2d 434 (C.A. 9, 1959), affirming 29 T.C. 154 (1957), certiorari denied 361 U.S. 821 (1959). The evidence indicates that job 248 was completed prior to September 30, 1957, and that jobs 237 and 247 were completed subsequent to September 30, 1957, and prior to March 31, 1958. These factors should be reflected in the computations under Rule 50.

### *Issue 2. Interest Deduction—Docket No. 962-62*

#### FINDINGS OF FACT

Prior to December 1958, Alto Adams and his wife borrowed $400,000 from the Prudential Insurance Co. of America, which loan was evidenced by a note and secured by a mortgage on 18,000 acres of Florida land owned by Adams. Subsequent to obtaining the $400,000 loan from Prudential, Adams conveyed approximately 2,000 acres of the mortgaged land to his son and his son's wife subject to the existing mortgage. By December 26, 1958, the original loan had a balance of $340,000 on which the accrued interest amounted to $9,019.44.

Adams applied for an increase in the loan in the amount of $260,000. On December 26, 1958, Prudential, after granting the loan application for $260,000, drew two checks on its special investment account with date, amount, and payee as follows:

| Date | Amount | Payee | Check No. |
|---|---|---|---|
| Dec. 26, 1958 | $9,019.44 | Prudential Insurance Co. of America | 44071 |
| Dec. 26, 1958 | 250,980.56 | Alto Adams, Alto Adams, Jr., Carra Adams, Dorothy S. Adams, and Thad H. Carlton [1] | 44070 |

[1] Attorney for Prudential.

Prudential applied check No. 44071 to the accrued interest obligation of $9,019.44, leaving a balance of zero as to such interest account on December 26, 1958. The $9,019.44 was interest on the original loan, not the new loan.

With respect to check No. 44070, the closing attorney, after deducting "costs" of $1,402.25, disbursed the net proceeds of the loan to the borrowers by check for $249,578.31, at which time the borrowers gave him a promissory note payable to Prudential in the amount of $260,000.

Prudential insisted that the same collateral, 18,000 acres of land, be pledged to secure the additional loan. This meant that Adams'

son and his wife, who then owned approximately 2,000 of the 18,000 acres, had to sign the mortgage and the loan papers.

Adams received the proceeds of the original loan and of the additional loan. He also made all payments of principal and interests on both the original note and the additional note.

Adams claimed a deduction in the amount of $9,019.44 for interest on his 1958 return, which respondent disallowed on the grounds that the interest was not paid in 1958. Adams' son never claimed a deduction for any interest on the loans.

With respect to his individual Federal income tax return, Adams was on the cash basis.

### OPINION

Section 163(a) of the 1954 Code provides "There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness." Adams, having been a cash basis taxpayer in 1958, must have "paid" the interest, within the meaning of the statute, to be entitled to the interest deduction for that year.

Respondent maintains that Adams' claimed deduction for interest in the year 1958 must be disallowed under the authority of the rule first adopted by this Court in *S. E. Thomason*, 33 B.T.A. 576 (1935), and enunciated clearly in *John C. Cleaver*, 6 T.C. 452 (1946), affd. 158 F. 2d 342 (C.A. 7, 1946), certiorari denied 330 U.S. 849 (1947), wherein it was said:

If an interest obligation is satisfied by the execution of a new note by the debtor on a cash basis, the interest will not be considered as "paid" within the meaning of section 23(b). [Cits. omitted.] Similarly, where a taxpayer on the cash basis who is indebted on a note for past due interest borrows from his creditor an amount in excess of this past due interest on a second note, and the creditor gives to the taxpayer the principal amount of the second note less the amount of past due interest on the first note and marks this interest "paid," we have held that no cash payment has been made which would warrant a deduction. [Cits. omitted.]

This rule was based on the decision of the Supreme Court in *Eckert* v. *Burnet*, 283 U.S. 140 (1931), which, while not involving an interest deduction, has been accepted as foundation for the rule as enunciated in *John C. Cleaver*, above. See also *Helvering* v. *Price*, 309 U.S. 409 (1940). This and other courts have, almost without exception, applied the rule to deny interest deductions to cash basis taxpayers where the interest obligation is satisfied by the taxpayer's note rather than cash. See *Francis R. Hart*, 21 B.T.A. 1001 (1930), affirmed on this issue 54 F. 2d 848 (C.A. 5, 1932); *Nina Cornelia Prime, Executrix*, 39 B.T.A. 487 (1939); *Albert J. Alsberg*, 42 B.T.A. 61 (1940); *Eli D. Goodstein*, 30 T.C. 1178 (1958), affd. 267 F. 2d 127 (C.A. 1, 1959); *James W. England, Jr.*, 34 T.C. 617 (1960); *Quinn* v.

*Commissioner*, 111 F. 2d 372 (C.A. 5, 1940), affirming a Memorandum Opinion of this Court; *Keith* v. *Commissioner*, 139 F. 2d 596 (C.A. 2, 1944), affirming a Memorandum Opinion of this Court. See, however, *Newton A. Burgess*, 8 T.C. 47 (1947).

We agree with respondent that the above rule is controlling on this issue and that under it Adams is not entitled to the subject interest deduction for 1958.

Adams argues that by conveying the land worth more than $9,019.44 to the trustee as security for the indebtedness, he in effect had "paid" the accrued interest on the old indebtedness with property. This contention is answered to the contrary by the Supreme Court in *Helvering* v. *Price, supra*, wherein the Court observed:

It [collateral] was given to secure respondent's promise to pay, and if that promise to pay was not sufficient to warrant the deduction until the promise was made good by actual payment, the giving of security for performance did not transform the promise into the payment required to constitute a deductible loss in the taxable year. * * *

The mortgage given by Adams here was given as security for his promise to pay and was no more "payment" of the interest than was the collateral payment of the loss in *Helvering* v. *Price, supra*.

Adams also attempts to distinguish *James W. England, Jr., supra*, on the grounds that here the $260,000 were "funds made available for disbursement" by him which he directed be applied in part to the payment of accrued interest, and is more like the $968.58 the respondent conceded was actually paid as interest in the *England* case.[6] There was no issue before the Court with respect to the $968.58 in the *England* case and respondent's concession there can be no authority for allowance of the deduction here.

### Issue 3. Sec. 691(c) Deduction—Docket No. 949–62

#### FINDINGS OF FACT

Schedule C of the Federal estate tax return for the estate of Alfred Q. Smith (father of petitioner Jan R. Smith) included in notes receivable one from Bona Allen Building Corp. in the amount of $140,000, with the following explanation:

$54,267.95 of this amount represents the unused cost of real estate sold under the installment method on July 1, 1947; the remaining $85,732.05 represents the unreported long-term capital gain to be reported as future collections of principal are made.

---

[6] This argument and this Court's decision in taxpayer's favor in *Newton A. Burgess*, 8 T.C. 47 (1947), on slightly different facts but having the same end result, leaves the writer of this opinion in some doubt as to whether the rule adopted by the courts is very practical. See dissenting opinion of Judge Leech in *S. E. Thomason*, 33 B.T.A. 576 (1935). However, the rule has been applied so often over a period of time without change in the law that it must be accepted as a correct application thereof.

In Schedule K, debts of the decedent, item No. 1 is as follows:

Note payable to Mrs. A. Q. Smith dated Nov. 18, 1942_____ $22, 000. 00
Interest at 6 percent per annum to Dec. 28, 1955 (78.664 percent)_____ 17, 306. 08

The above item was shown as a deduction in determining the net taxable estate. The revenue agent's report upon the examination of the estate tax return made no change in either Schedule C or Schedule K.

In the final income tax return for the estate of Alfred Q. Smith for the fiscal year ended November 30, 1957, a profit of $85,732.05 was reported from the principal payment of $140,000 received July 12, 1957, as long-term capital gain (other gains and losses increased capital gains to $85,825.41) ; and a deduction of $20,226.84 was claimed for the estate tax attributable to this profit under section 691(c) of the Internal Revenue Code.

In the final income tax return for the estate of Alfred Q. Smith for the fiscal year ended November 30, 1957, an ordinary deduction was claimed for interest paid to Mrs. A. Q. Smith in the amount of $19,341.08, which amount included the $17,306.08 accrued interest shown as a debt of the decedent at item No. 1, Schedule K, of the estate tax return for the estate of Alfred Q. Smith.

Jan R. Smith was a 50-percent income beneficiary of the estate of Alfred Q. Smith.

On his income tax return for 1957, petitioner Jan R. Smith claimed an ordinary loss in the amount of $20,646.53 from the estate of Alfred Q. Smith. Respondent determined that the loss sustained by petitioner Smith from the estate of A. Q. Smith "was overstated in the amount of $10,113.41 due to the fact that on Form 1041 income tax return of the Estate of Alfred Q. Smith there was erroneously claimed an ordinary deduction of $20,226.84 under section 691(c) for estate tax deduction now claimed by you." Respondent then determined and allowed petitioner Smith a "deduction under section 691(c) * * * for Estate tax paid in respect of a decedent in the amount of $4,638.14," by determining—

Accrued income included in gross estate of Alfred Q. Smith:

| | | |
|---|---|---|
| Accrued dividends_____ | $851. 05 | |
| Accrued interest_____ | 116. 87 | |
| Unreported gain on mortgage note_____ | 85, 732. 05 | |
| Total_____ | | $86, 699. 97 |
| Accrued deductions: | | |
| Georgia intangible tax_____ | 1, 003. 18 | |
| Accrued interest_____ | 17, 306. 08 | |
| | | 18, 306. 26 |
| Net value included in gross estate_____ | | 68, 390. 71 |

Alfred Q. Smith's estate, for estate tax purposes, included unrealized gain in the amount of $85,732.05. Estate tax was computed taking this inclusion into account. The gain was received by the estate in its taxable year 1957, and a deduction was claimed by the estate with respect to the estate tax paid on this item under section 691(c).[7] This produced a net loss in the income of the estate, which petitioner, Jan R. Smith, as a beneficiary of the estate, claimed on his return for 1957. Respondent disallowed the deduction to the estate and as a result disallowed a part of the loss claimed on Smith's return from this source, but allowed a deduction to Smith under section 691(c) for estate tax paid with respect to a decedent. It is our understanding from the opening statement of his counsel that petitioner Smith concedes the disallowance of the loss from the estate but contends that the deduction allowed him under section 691(c) was erroneously computed by respondent and should be greater than the amount allowed.

In summary, section 691(c) permits a deduction for income tax purposes in the taxable year that a taxpayer realizes income from an item which was included in the gross estate of a predecessor-decedent. The deduction is measured by the estate tax attributable to the net value of such items which were included in the taxable estate of the decedent. Basically, the computation of the estate tax attributable to the item and to similar items requires a recomputation of estate tax by excluding such items from the original taxable estate, and subtracting the resulting tax from the tax originally paid.

We are unable to discern from the pleadings or from the briefs at which point petitioner disputes respondent's computation of the deduc-

---

[7] SEC. 691(c). DEDUCTION FOR ESTATE TAX.—

(1) ALLOWANCE OF DEDUCTION.—

(A) GENERAL RULE.—A person who includes an amount in gross income under subsection (a) shall be allowed, for the same taxable year, as a deduction an amount which bears the same ratio to the estate tax attributable to the net value for estate tax purposes of all the items described in subsection (a)(1) as the value for estate tax purposes of the items of gross income or portions thereof in respect of which such person included the amount in gross income (or the amount included in gross income, whichever is lower) bears to the value for estate tax purposes of all the items described in subsection (a)(1).

\* \* \* \* \* \* \*

(2) METHOD OF COMPUTING DEDUCTION.—For purposes of paragraph (1)—

(A) The term "estate tax" means the tax imposed on the estate of the decedent or any prior decedent under section 2001 or 2101, reduced by the credits against such tax.

(B) The net value for estate tax purposes of all the items described in subsection (a)(1) shall be the excess of the value for estate tax purposes of all the items described in subsection (a)(1) over the deductions from the gross estate in respect of claims which represent the deductions and credit described in subsection (b). Such net value shall be determined with regard to the provisions of section 421(d)(6)(B), relating to the deduction for estate tax with respect to restricted stock options.

(C) The estate tax attributable to such net value shall be an amount equal to the excess of the estate tax over the estate tax computed without including in the gross estate such net value.

tion which appears in the notice of deficiency. Petitioner presents a computation on brief which employs amounts which we cannot find supported in the record—for example, the gross estate as originally reported and the marital deduction. But even assuming that the taxable estate revised by eliminating the items mentioned in section 691(c) was $218,240.23, as shown by petitioner's computations, it is readily apparent that petitioner has miscalculated the gross estate tax on his revised taxable estate. As a result of this error his computation of the estate tax attributable to the item is overstated, and the deduction is incorrectly increased. This error gives rise to the controversy.

Petitioners have failed to carry their burden of proving that respondent's computations or his determination on this issue are erroneous. We hold for respondent on this issue.

*Decisions will be entered under Rule 50.*