WILLIAM L. COMER FAMILY EQUITY PURE TRUST, MYRA L. COMER, TRUSTEE, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Comer Family Equity Pure Trust v. Commissioner
Docket Nos. 16793-85, 16821-85, 16825-85, 16826-85, 13793-86, 25767-87
United States Tax Court
T.C. Memo 1990-316; 1990 Tax Ct. Memo LEXIS 334; 59 T.C.M. (CCH) 980; T.C.M. (RIA) 90316; June 25, 1990, Filed Gary A. Kozma, for the petitioners. Karen J. Goheen, for the respondent. GOFFE, Judge. GOFFE
MEMORANDUM *335 FINDINGS OF FACT AND OPINION These consolidated cases are before us on petitioners' motions for litigation costs under section 7430[2] and Rule 231, and for sanctions under Rule 33(b). The cases bearing 1985 docket numbers were set for trial in Detroit, Michigan, at which time the parties advised the Court that they had reached a basis of settlement. The parties submitted agreed decisions which the Court entered. After the decisions were entered petitioners filed motions for litigation costs. We denied the motions because section 7430(e) of the Internal Revenue Code of 1954, as amended, requires that the order awarding or denying litigation costs must be embodied in the decision. We held, therefore, that the motions were untimely and, furthermore, we found no evidence that respondent had been unreasonable. *336 Petitioners then filed motions to vacate our decisions, which we denied. Petitioners appealed to the United States Court of Appeals for the Sixth Circuit which reversed and remanded. The Court of Appeals in Comer v. Commissioner, 856 F.2d 775 (6th Cir. 1988), held that the motions for litigation costs were timely and that we should consider whether the conduct of respondent was unreasonable for the periods prior to the filing of the petitions in this Court as well as after the filing of the petitions. The cases docketed at 13793-86 and 25767-87 were also settled. The parties filed stipulations of settlement, after which time petitioners filed motions for litigation costs in those cases. In addition, petitioners filed a motion for sanctions against respondent in these latter two cases. We consolidated all of the cases for trial, briefing, and opinion and ordered petitioners in the cases bearing 1985 docket numbers to file new motions for litigation costs and granted respondent leave to file responses to all of the motions for litigation costs and petitioners' motion for sanctions. Respondent filed notices of objections and memoranda in support of his notices *337 of objection. After all of the motions, notices of objection, and memoranda were filed, we held a hearing on the entire matter in Detroit, Michigan, at which time the parties submitted a stipulation of facts with accompanying exhibits and the oral testimony of witnesses. The hearing lasted two days. The Commissioner determined the following deficiencies in and additions to petitioners' Federal income taxes: Docket
Taxable
Sec.
Sec.
Petitioner
Number
Year
Deficiency
6651(a)
6653(a)(1)
William L. Comer
16793-85
1981
$   2,092.54
$   104.63
$   104.63
Family Equity
Pure Trust
William L. Comer
16821-85
1981
3,126.52
-- 156.33
and Myra L. Comer
T.R.Y.E.-A Trust
16825-85
1981
10,362.45
518.12
518.12
American Way Trust
16826-85
1981
2,527.00
505.40
126.35
William L. Comer
13793-86
1982
32,112.40
-- 1,605.62
and Myra L. Comer
William L. Comer
1982
2,419.40
120.97
120.97
Family Equity
Pure Trust
American Way Trust
1982
655.44
32.77
32.77
T.R.Y.E.-A Trust
1982
540.74
27.04
27.04
Financial Freedom
1983
23,329.52
1,166.48
1,166.48
Consultants
William L. Comer
25767-87
1983
114,971.80
-- 5,748.59
and Myra L. Comer
William Comer
1983
8,268.78
-- 423.44
Trust
American Way Trust
1983
7,569.00
-- 378.45
Financial Freedom
1984
66,512.06
-- 3,325.60
Consultants
*338 Additions to Tax
Sec.
Sec.
Sec.
Sec
Petitioner
6653(a)(2)
6654
6655
6661
William L. Comer
*
$   136.59
--  --   Family Equity
Pure Trust
William L. Comer
*
243.89
--  --   and Myra L. Comer
T.R.Y.E.-A Trust
*
164.95
--  --   American Way Trust
*
164.95
--  --   William L. Comer
*
3,185.11
--  $  3,211.24
and Myra L. Comer
William L. Comer
*
--  $   217.10
--   Family Equity
Pure Trust
American Way Trust
*
--  58.80
--   T.R.Y.E.-A Trust
*
--  48.53
---   Financial Freedom
*
--  2,083.64
2,332.95
Consultants
William L. Comer
*
--  --  28,742.95
and Myra L. Comer
William Comer
*
--  --  2,067.20
Trust
American Way Trust
*
--  --  1,892.25
Financial Freedom
*
--  --  16,628.02
Consultants
The *339 issues are whether petitioners are entitled to an award of litigation costs under section 7430, and whether sanctions should be imposed against respondent under Rule 33(b). FINDINGS OF FACT Some of the facts in these consolidated cases have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners William L. Comer and Myra L. Comer (the Comers) [3] are individuals who resided at 9260 E. Colonville Road, Clare, Michigan, at the time they filed their petitions. Petitioners William L. Comer Family Equity Pure Trust (Comer Family Trust), American Way Trust, T.R.Y.E.-A Trust (T.R.Y.E.), and Financial Freedom Consultants are each entities whose address was 9260 E. Colonville Road, Clare, Michigan, at the time their petitions were filed in this case. During the years in issue, the Comers, and/or their children, were the designated trustees of each of these entities. *340 1981
The Comers filed a joint Federal income tax return for the taxable year 1981. On the Schedule E, Supplemental Income Schedule, attached to this return the Comers reported income in the amount of $ 1,252 from the American Way Trust. The only other income which the Comers reported on their 1981 return was commissions and trustee or fiduciary fees paid to them by T.R.Y.E. in the amount of $ 5,250, and by the Comer Family Trust in the amount of $ 25. On Schedule SE, Computation of Social Security Self-Employment Tax, they computed and reported their self-employment tax on the $ 5,275 received from the Trusts. The Comers filed an amended joint Federal income tax return for the taxable year 1981, claiming a refund of the self-employment tax. They noted on their amended return that Self-employment taxes were paid or credited on income received as Fiduciaries (i.e., Trustees) of certain Trusts. As such, such taxes were paid erroneously as such income is clearly NOT subject to self-employment taxation.
Comer, as trustee, filed fiduciary income tax returns for the Comer Family Trust, the American Way Trust, and T.R.Y.E. for the taxable year 1981. The *341 Comer Family Trust reported income of $ 1,097.33 from expense reimbursements, $ 9,500 from a distribution from T.R.Y.E., and $ 5,300 net rental income. On Schedule C attached to its return, the Comer Family Trust reported net income of $ 2,142.95 from a sales business known as Constitution Enterprises and $ 4,741.95 net capital gain. The business address of Constitution Enterprises was listed as "9260 Colonville Rd., Clare, Michigan 48617." The Trust claimed farming losses on Schedules F for Farm Operation No. 1 in the amount of $ 3,586.49 (income from stud fees of $ 75 and expenses of $ 3,661.49), and for Farm Operation No. 2 in the amount of $ 9,955.05. Farm Operation No. 1 claimed depreciation on, among other assets, an Appaloosa stallion. Both Schedules F listed the addresses of the farms as "9260 E. Colonville Rd., Clare, Mich. 48617." The Trust also claimed deductions for administrative expenses of $ 28,182.72 (including the $ 25 fiduciary fee reported on the Comers' return) and for long term capital gain of $ 2,845.17. For 1981, the American Way Trust reported interest income of $ 1,700 and Schedule C net income from an automobile rental business of $ 5,395.53 (income *342 of $ 14,276.93 and expenses of $ 8,881.40), and claimed deductions for, among other things, a net operating loss carryover of $ 1,769.70 and distributions to Trust beneficiaries of $ 6,260, including $ 2,624 to Comer and $ 1,252 to Myra L. Comer. Only the distribution to Myra L. Comer, however, was reported on the Comers' return. The address of the automobile rental business was listed as "P.O. Box 88, Clare, Michigan 48617." For 1981, T.R.Y.E. reported interest income of $ 675, net rent and royalty income of $ 1,740, and Schedule C income from a retail sales and service business of $ 6,464.48 (income of $ 42,180.86 and expenses of $ 35,716.38). Although "books" was the product listed for the business, it claimed depreciation on a chain saw, among other assets. The indicated business address was "9260 Colonville Rd (P.O. Box 88), Clare, Michigan 48617." T.R.Y.E. also claimed deductions for a loss from an oil drilling joint venture of $ 5,000, a loss in the amount of $ 4,883.29 on Schedule F (Farm Income and Expenses), a net operating loss carryover of $ 4,624.40, and distributions to the Comer Family Trust of $ 9,500. The farm address was listed as "9260 E. Colonville Rd., Clare, *343 Mich. 48617." On January 1, 1980, the Comers, as trustees of the Comer Family Trust, leased the house, three-car garage, and parking space located at 9260 E. Colonville Road, which was their personal residence, to the trustees of T.R.Y.E. (also the Comers) for $ 650 per month. On June 1, 1980, the trustees of T.R.Y.E. executed a "Trustee's Employment Agreement" with Comer. T.R.Y.E. was to provide compensation to Comer in the amount of $ 10,200 per year for services rendered. According to the Agreement, T.R.Y.E.'s "principal place of business" and "general office" were the Comers' residence on East Colonville Road. T.R.Y.E. also agreed to provide housing to Comer, "mandatory on a 24 hour basis," at that same location. The American Way Trust leased automobiles to T.R.Y.E., to the Comers personally, and to Financial Freedom Consultants, another Comer family trust established in 1982. Two of the Lease Agreements were on Educational Scientific Publishers (E.S.P.) forms. Comer controlled, directly or indirectly, all of these trusts. By 1981, he had created an interlocking network of entities through which he channeled and controlled the Comer family income and assets. The Comer *344 Family Trust, when originally created in 1975, was identical to the trust held to be a sham in Markosian v. Commissioner , 73 T.C. 1235 (1980); Vercio v. Commissioner, 73 T.C. 1246 (1980).[4] For taxable years 1975 through 1980, the Comers agreed to collapse all of the income and expenses of the family trusts onto their joint income tax returns and they further agreed to the imposition of the addition to tax for negligence under section 6653(a) for taxable years 1975 through 1979. On January 18, 1983, Revenue Agent Daniel G. Balogh (Balogh) wrote to Comer to advise him that he would be conducting an audit of the fiduciary income tax returns for T.R.Y.E. and the Comer Family Trust for the taxable year 1981. Balogh scheduled an audit for March 3 and 4, 1983, at 9260 E. Colonville Road, Clare, Michigan. Balogh attached a Form 4564, Information *345 Document Request, to his letter listing the information which he needed for the audit. Comer received Balogh's letter on or about January 20, 1983, but the scheduled audit did not take place. Ramon M. Slaughter (Slaughter), Comer's Certified Public Accountant, contacted Balogh on March 2, 1983, and advised Balogh that he had all of the records and that Comer would be out of the country on March 3 and 4. The notations on Comer's calendar and datebook, however, indicate that he was to see Dr. Allen on March 3, 1983, and was to get a gun permit from the Sheriff on March 4, 1983. On March 16, 1983, Balogh wrote to Comer rescheduling the audit for April 11 and 12, 1983, at Comer's Clare address. Balogh told Comer that he had been contacted by Slaughter but that he could not discuss the audit with Slaughter because Balogh had received no power of attorney. On March 18, 1983, Comer wrote to Balogh stating that he would be out of the country at the time of the rescheduled audit and that Slaughter, as a trustee of both Trusts, was the person who should be handling the audit and all further communications. On March 21, 1983, Balogh again wrote to Comer to reschedule the audit for April *346 25 and 26, 1983, at Comer's Clare address. In this letter, Balogh pointed out that Slaughter was not listed as a trustee on the fiduciary income tax return for either the Comer Family Trust or T.R.Y.E. Slaughter wrote to Balogh on March 28, 1983, asking that the audit be conducted at his place of business because Slaughter had all the records. Balogh, however, wanted to conduct the audit at the Clare location because the returns of the Trust showed that they incurred considerable business expenses there, and sound audit procedure required him to inspect and analyze the business operations. In fact, as mentioned above, the returns of the Trust indicated that all of their business or farming activities were at the Clare address. It was a strong policy of Balogh's Internal Revenue Service (I.R.S.) district that all interviews be conducted at the taxpayer's business location. When Balogh went to Comer's residence on April 25, 1983, for the rescheduled audit he was still under the impression that he could perform the audit there. Myra L. Comer told Balogh that her husband was out of town and refused to admit him or show him any records, saying that she had been told not to. Comer *347 had a sign on his property saying, "No Trespassing without Permission, and This Particularly Applies to Agents and Officers and Employees of the Internal Revenue Service and the State and Federal Government," or words to that effect. Balogh, nevertheless, quickly viewed the premises, noted that there were no farm operations, and left. On that same date, after his unfruitful meeting with Mrs. Comer, Balogh went to Harrison, Michigan, the county seat of Clare County, to see what documents regarding the trusts were recorded. He reviewed and made notes of the documents for American Way Trust, T.R.Y.E, and the Comer Family Trust, as well as an amendment for the Comer Family Trust. On June 16, 1983, the I.R.S. issued summonses to the Comers with respect to the field audit of their individual joint Federal income tax return and fiduciary income tax returns for T.R.Y.E. and the Comer Family Trust for the taxable year 1981. The summonses directed the Comers to appear on July 7, 1983, at 316 N. Mission Street, Mt. Pleasant, Michigan. Balogh left the three summonses on the Comers' front porch but was not certain they had been properly served. His supervisor Artis Pruitt (Pruitt), therefore, *348 decided not to enforce the summonses. Comer admits, however, that he did receive the summonses about the date they were left on his porch. The Comers did not appear on July 7, 1983, and Balogh never received testimony from them. The I.R.S. issued summonses to Slaughter with respect to the field audit of the fiduciary income tax returns for T.R.Y.E. and the Comer Family Trust, as well as the joint Federal income tax return for the Comers for the taxable year 1981. Slaughter was directed to appear July 18, 1983, at "110 Michigan N.E." Slaughter ultimately was allowed to bring the records to the Grand Rapids office of the I.R.S. rather than the Mount Pleasant office. Balogh spent 3 days in July of 1983 going through everything provided by Slaughter. At the end of the 3-day period, Balogh interviewed Slaughter. On a Report Transmittal dated September 14, 1983, with respect to the audit, Balogh wrote: taxpayers were totally uncooperative during the audit and never gave any testimony. The farm operations of the trusts were not allowed due to their highly questionable nature and the fact that Mrs. Comer refused to let me tour the "Farm" * * *.
In the attached *349 report dated December 5, 1983 entitled, "Manager's Involvement," Pruitt noted: Mr. Comer is a tax protestor, who lives in a rural area of Clare Michigan. On 11-22-83 I visited Mr. Comer, who stated that he doesn't agree with the IRS position, therefore the case is being recommended to appeals. Taxpayer was congenial to talk too [sic], but will not submit or answer questions pertaining to his activities * * *.
Pruitt visited the Comer's residence in an effort to resolve the audit. Pruitt spoke to Comer, told him that the I.R.S. was still having some problems resolving the examination, and asked Comer to call him within a week or so. Although Comer indicated that he would call Pruitt, he did not do so. On September 15, 1983, in anticipation of being promoted and transferred to another assignment, Balogh completed his report even though he had numerous unanswered questions. Balogh did not contact Comer for a closing conference because he did not believe that Comer would meet with him or provide any further information, and because of Balogh's new assignment. In April or the first part of May 1984, Revenue Agent John L. McKenzie (McKenzie) was asked *350 to rewrite the report, following the reviewer's memorandum. The file, for example, did not contain a return for American Way Trust and he had to reconstruct that fiduciary income tax return for the taxable year 1981 using data either from the other entities or from the work papers identifying deductions and income. On March 14, 1985, the Commissioner mailed the statutory notices of deficiency with respect to the Comers, the Comer Family Trust, American Way Trust, and T.R.Y.E. for the taxable year 1981. The general approach of the notices issued to the Comers was to collapse all income and verifiable deductions reported by the Trusts onto the joint return of the Comers, on the theory that the Trusts were grantor trusts or shams. Trust payments (fiduciary fees and distributions) which the Comers had reported on their return were eliminated. Balogh and McKenzie went through the records which Slaughter provided and allowed expenses which they concluded were deductible. Most of the business and farm expenses claimed by the Trusts were allowed to the Comers. For example, with respect to the Comer Family Trust, all of the deductions claimed on Schedule C with respect to Constitution *351 Enterprises were allowed to the Comers, as was the entire $ 9,955.05 loss from Farm Operation No. 2 on Schedule F. Of the expenses in the amount of $ 3,661.49 claimed on Schedule F of Farm Operation No. 1, $ 744.93 was allowed to the Comers, as were some of the $ 28,182.72 administrative deductions (as itemized deductions). The notices of deficiency issued to the Trusts, however, did not treat them as shams but as associations taxable as corporations. The treatment of the deductions of the Trusts in these notices was not entirely consistent with that of the notice of deficiency issued to the Comers, but the inconsistencies were in both directions. For example, only $ 744.93 of the expenses of Farm Operation No. 2 reported on the return of the Comer Family Trust were allowed to the Comers, but all of the expenses were allowed to the Trust. By contrast, all of farming loss claimed on Schedule F attached to the return of T.R.Y.E. in the amount of $ 4,883.29 was allowed to the Comers, but only $ 2,124.00 of the loss, representing depreciation on the breeding herd, was allowed to the Trust. The Trusts were allowed to deduct none of the payments which they made to the Comers or to *352 the other Trusts. However, payments which the Trusts received from other Trusts (e.g., rental income in the amount of $ 5,300 and the $ 9,500 distribution which T.R.Y.E. paid to the Comer Family Trust) were not eliminated from their income. The Commissioner issued the notices of deficiency to the Trusts in order to preserve the issues of their classification status and of the proper amount of their income and expenses in the event they were determined not to be shams or grantor trusts. On March 18, 1985, Comer wrote to Bonita Hall (Hall), whose name appeared as the "Person to Contact" on the statutory notices of deficiency, that he was in disagreement with the findings. Comer requested an appointment with the "Chief Appellate Officer (who also must be completed [sic] familiar with trust law) as soon as possible after April 20th which is the first time that my accountant will be free." On April 19, 1985, Comer wrote to Hall complaining that he had not received a response to his March 18 letter and further stating, If we do not hear from you or your office within the next fifteen (15) days from the date of this letter, we will assume this to be a denial of an Appellate *353 Hearing, and all our rights pertaining thereto, and will then be forced to initiate proceedings to resolve this issue in the appropriate Courts of Law.
On August 22, 1985, Robert L. Tharpe, an Appeals Officer, wrote to Comer about arranging a conference. Comer responded on August 27, 1985, writing: Mr. Tharpe, it is far too late to handle any type of appeal procedure at this date as I'm sure you and your superiors are well aware of. This case has long since been filed in the U.S. Tax Court, with numerous charges relating thereto being levied against the Internal Revenue Service, and, in fact, the Service has already answered the Petition. It appears to me that you and your superiors are now attempting to "cover your tracks", long after the crime has been committed and the complaint lodged in the Courts. As such, your request has come long too late to be effective as the case is now being processed in the Courts.
On October 23, 1985, John F. Eckert, Associate Chief, Appeals Office, wrote to Comer telling him that the case had been referred to District Counsel for preparation for trial because the parties were not able to reach a mutually satisfactory *354 basis of settlement. An informal, pre-trial conference to stipulate facts was arranged for March 13, 1986, but was rescheduled for April 10, 1986, because, after agreeing to the earlier date, Comer wrote to respondent's attorney, Margaret Satko (Satko), saying that he subsequently learned that he was scheduled to be out of town for 2 to 3 weeks. Trial notices were mailed to Comer on February 18, 1986, setting cases for trial at the trial session of the Court beginning May 12, 1986, in Detroit, Michigan. At his attorney, Frank Hider's (Hider) suggestion, Comer wrote to Satko on February 21, 1986, requesting, among other things, copies of revenue agents' reports, work papers, and memoranda prepared during the course of examinations for the years 1975 through 1980. Comer asked that these materials be received no later than March 7, 1986. Comer wrote to her again on March 10, 1986, and apologized for putting her "on the spot time-wise" by asking for documents by March 7 because he had not realized that Satko would be out of town. In this letter, Comer told her that he and Hider would meet with her on April 8 for the stipulation conference and also to review the administrative files *355 for the years 1975 through 1981. On March 13, 1986, Satko wrote to Comer confirming her understanding of a telephone conversation they had on March 10, 1986, about their upcoming meeting. She stated that Comer would be allowed to review the administrative file. Her supervisor, District Counsel Charles S. Stroad (Stroad), however, wrote to Comer on March 14, 1986, Please be advised that our offer to allow you to review our administrative file was limited to the files for the 1981 taxable year of the above-referenced petitioners. The cases [at docket Nos. 16793-85, 16821-85, 16825-85, 16826-85] before the Court deal only with the 1981 taxable year. Thus, whatever occurred in the prior years is irrelevant.
Comer and his C.P.A., Jess Lothamer, met over a 3-day period with Satko and Revenue Agent Lyndon Ford (Ford) beginning April 10, 1986. Satko had been assigned to help settle the Comers' cases for the taxable years 1975 through 1980 and hoped to be able to settle the 1981 cases on the same basis as in the past, i.e., by collapsing all of the Trusts' income and expenses onto the Comers' individual return. Based on her past experience of heated arguments *356 with Comer on the grantor and sham trust issues, she decided to begin by focusing on substantiation of expenses. Ford went through the documents and business records provided by Comer in order to determine whether they would substantiate the various deductions claimed. For the first time Comer provided oral testimony by responding to Ford's questions and otherwise explaining the items in question. Once it was determined which expenses were allowable, Satko agreed to collapse the income and expenses onto the Comers' individual joint Federal income tax return for the taxable year 1981. She performed the calculations, which showed that there was no deficiency. She so informed Comer and told him that there was, thus, no need to litigate the grantor/sham trust issues. Comer agreed to settle the case on the basis of her approach and calculations. Satko then explained to Comer how the audit process worked, including the issuance of the 30-day letter, and explained further that Comer could protest the 30-day letter to appeals and get appeals' consideration immediately. During the settlement negotiations, attorneys fees and litigation costs were never discussed. On April 24, 1986, Stroad *357 wrote to the Comers enclosing the decision documents, which the Comers signed and returned to Satko on May 1, 1986. The Court entered decisions in the cases at docket Nos. 16793-85, 16821-85, 16825-85, 16826-85 on May 27 and May 28, 1986. 1982 and 1983
The Comers filed a joint Federal income tax return for the taxable year 1982 on which they reported income in the amount of $ 6,663.99. On schedules SE, they reported and computed self-employment tax on that income, but later filed an amended joint Federal income tax return for the taxable year 1982, claiming a refund of the self-employment tax. Petitioners noted on their amended return that Self-employment taxes were paid or credited on income received as Fiduciaries (i.e., Trustees) of certain Trusts. As such, such taxes were erroneously paid as such income is clearly NOT subject to self-employment taxation.
Comer, as trustee, filed fiduciary income tax returns for the Comer Family Trust, the American Way Trust, and T.R.Y.E. for the taxable year 1982, and for Financial Freedom Consultants for the taxable year ended February 28, 1983. The Trusts generally reported income and losses from the same sources *358 as for 1981. The Comer Family Trust return, for example, included a Schedule C for Constitution Enterprises and a Schedule F for Farm Operation No. 1 (there was no Schedule F for Farm Operation No. 2). This return, however, also indicates that the residence/office building at 9260 E. Colonville Road in Clare was sold in May 1982 to an unrelated party. Schedule D reports gain from the installment sale of the property, a computation of which is attached to the return. Although the attachment indicates that the residence was sold in May of 1982, it is still listed as the address of the Comer Family Trust as late as March 29, 1983, the date of the return. Also, the Schedule F (Farm Income and Expenses) attached to the return shows a loss (including a depreciation deduction for an Appaloosa stallion) with respect to a farm operation at 9260 E. Colonville Road, Clare, Michigan. The American Way Trust claimed a loss in the amount of $ 3,649.30 on the Schedule C attached to its return for an automobile rental business located at "P.O. Box 88, Clare, Michigan 48617." T.R.Y.E. claimed a loss in the amount of $ 429.21 on the Schedule C for a retail sales and service business at 9260 E. *359 Colonville Road, Clare, Michigan. Although Schedule C listed the product sold by T.R.Y.E. as books and materials, its depreciation schedule included a chain saw. Sometime in 1982, the American Way Trust foreclosed on T.R.Y.E. trust because T.R.Y.E. was behind on a lease payment. A new entity, however, had been added to the Comer family trust collection. Financial Freedom Consultants was established on February 1, 1982, and its first taxable year ended February 28, 1983. Comer and his son, Scott C. Comer, were its trustees. On its fiduciary income tax return for the taxable year ending February 28, 1983, Financial Freedom Consultants claimed a Schedule C loss from a publishing business known as Financial Freedom Publishers. The address listed for both Financial Freedom Consultants and Financial Freedom Publishers, as late as April 27, 1984, was "9260 Colonville Road, Clare, Michigan 48617," even though the residence at that location was supposedly sold in May of 1982. One of the expenses listed on the Schedule C was "Management Fees" of $ 8,557.41. A Form 1099 NEC (Non-Employee Compensation) for 1982, issued by Financial Freedom Consultants and attached to the return, shows *360 that this amount was paid to Comer during calendar year 1982. Comer, however, reported only $ 6,019.90 in income on the Comers' 1982 return. Also, in the amended return which he filed, Comer claimed that none of this income was subject to self-employment tax. However, the income was labeled "Management Fees" and reported on a Form 1099 used to report self-employment income. Financial Freedom Consultants leased automobiles from the American Way Trust. On March 1, 1982, the trustees of Financial Freedom Consultants executed a "General Manager's Agreement" with Comer. Financial Freedom Consultants was to provide a minimum compensation to Comer in the amount of $ 6,000 per year, plus a commission of 10 percent of the adjusted gross income of the Trust for "publishing, selling and distributions [sic] books and printed matter and in financial consulting and research services." The advertisement for Financial Freedom Consultants in the May 1983 "The Duck Book Digest" shows that it was managed by W. L. Comer, Trustee, author of "Freedom, Taxes & You," and further indicates that Financial Freedom Consultants' services include irrevocable living trusts, business trusts, and charitable *361 trust programs, "High-Yield, Low-Risk income programs (annual yields in excess of 40%)," and "Tax Shelters -- Equipment Leasing, Research & Development, Cattle Breeding and Gold Mining." By lease dated June 1, 1982, the Comers, as trustees of the Comer Family Trust, leased the house, three-car garage, and parking space located at 9260 E. Colonville Road to the trustees of Financial Freedom Consultants for $ 7,800 payable in quarterly installments in the amount of $ 1,950. This was the same house that the Comer Family Trust's 1982 return showed had been sold to unrelated parties in May of 1982. The Comers filed a joint Federal income tax return for the taxable year 1983. The Comers reported income from consulting fees in the amount of $ 19,484.52. They also claimed a $ 2,000 loss and a $ 20,000 investment tax credit from a tax shelter known as Alternative Energy Systems. However, they later filed an amended return eliminating these items. They also claimed a net operating loss carryover "from 1980, 1981 and 1982 business operation" of $ 29,499.01, reduced to $ 14,000 by the amended return. Myra L. Comer, as trustee for the William Comer Trust and the American Way Trust, filed *362 fiduciary income tax returns for these entities for the taxable year 1983. Comer, as trustee for Financial Freedom Consultants, filed a fiduciary income tax return for that entity for the taxable year ended February 29, 1984. The Comer Family Trust return (under the name of William Comer Trust) reported income from distributions from Financial Freedom Consultants of $ 27,000. It listed its address as, and claimed a loss of $ 8,060.70 from the rental of, the Comer residence at "9260 Colonville Road," although the 1982 return indicated that the residence had been sold in May of that year, and the Trust reported $ 89.05 of gain on the 1983 return from the sale. The Trust claimed a loss of $ 2,562.03 from Farm Operation No. 1 (now the only farming operation), and a deduction of $ 10,375 for distributions to beneficiaries, including the Comers' daughters and Mt. Zion Constitutional Fund, which was also listed at the Comer's residence on Colonville Road. The American Way Trust return listed its address as the Comers' Colonville Road residence, and reported income from the automobile rental business of $ 15,309.83. The return indicated that the Trust acquired a Lincoln Continental *363 automobile in 1983 for use in this business and claimed depreciation and investment tax credit for it. The Trust also claimed a net operating loss carryover from 1982, and a deduction of $ 925 for distributions to the Comers' daughter, Lee Anne Comer, a Trust beneficiary. Financial Freedom Consultants' return for the taxable year ending February 28, 1984, also listed its address as the Comers' Colonville Road residence, and reported income from the publishing business of $ 40,821.92 (income of $ 147,846.94 and expenses of $ 107,025.02). Included in the expenses were $ 6,020 in commissions and $ 20,909.52 of "manager compensation" paid to Comer, $ 14,203.13 in automobile lease payments paid to the American Way Trust, and $ 7,800 rent on business property paid to the Comer Family Trust. Although the return indicates that the Financial Freedom Consultants paid almost $ 27,000 in various forms of compensation to Comer, the Comers reported only $ 19,484.52 in income from consulting fees on their 1983 return. On March 6 and 7, 1985, Revenue Agent Doris A. Edwards (Edwards) wrote to Comer indicating that the Comers' individual joint Federal income tax return and fiduciary income tax *364 returns for the Comer Family Trust, the American Way Trust, and T.R.Y.E. for the taxable years 1982 and 1983, had been assigned to her for examination. Edwards asked to meet with Comer or his accountant or lawyer on March 28 and 29, 1985, and enclosed a list of items she needed for her examination, including copies of the original Trust instruments and all subsequent amendments, copies of the fiduciary income tax returns for the Trusts for 1978 through 1981, and copies of bank statements and other financial records of the Trusts. Edwards also asked for additional material or explanations with respect to several questions raised by the returns of the Trusts, e.g., the depreciation by T.R.Y.E. of a chain saw in a business selling books and materials; the invoice and contract for the Lincoln Continental shown on the depreciation schedule of the American Way Trust; and the sales agreement, as well as verification of the cost, selling price, and principal payments, for the sale in 1982 of the residence/office building at 9260 E. Colonville Road by the Comer Family Trust. On March 23, 1985, Comer wrote to Edwards stating that the Comers had executed a Form 2848-D, Tax Information Authorization *365 and Declaration of Representative, and enclosed copies of the Acceptance of Trusteeship forms executed by Slaughter in 1980 for the American Way Trust, the Comer Family Trust, and T.R.Y.E.
On March 26, 1985, Edwards wrote to Comer asking that he provide signed Forms 2848-D for the Trusts. In this letter she asked that Comer inform her of when they could meet so that she could review the information she requested on March 7, 1985. On April 6, 1985, Edwards received Forms 2848-D that designated Slaughter as authorized to act on behalf of American Way Trust, the Comer Family Trust, and T.R.Y.E.
On April 9, 1985, Comer forwarded to Slaughter two metal file boxes, one for the year 1982 and one for 1983, containing the records requested by Edwards. In his cover letter to Slaughter, Comer answered many of the questions raised by Edwards in her original notices to Comer, including the depreciation by T.R.Y.E. of the chain saw. Edwards drove to Grand Rapids, met with Slaughter at his home, and went through the records carefully. After making schedules of bank statements, check registers, and receipts for expenses, however, Edwards found that she did not have a complete set of anything. *366 She asked whether there were any other records and was told by Slaughter that those were the only records he had. Edwards explained to Slaughter that she needed to speak to Comer to go over, for instance, his use of the automobiles. She was, however, never able to meet with Comer. Edwards subsequently discovered the existence of Financial Freedom Consultants. On April 19, 1985, Edwards sent a handwritten note to Comer requesting copies of all returns filed for, and all income and expense records of, Financial Freedom Consultants, mileage records for 1983 and 1984 of a Lincoln automobile, and copies of individual returns of the Comers and the fiduciary returns of the American Way Trust and the Comer Family Trust for the taxable year 1984. Edwards needed the information as to Financial Freedom Consultants in order to complete her audit because the bulk of the income and expenses of the Comers and the related Trusts was shown on the returns for Financial Freedom Consultants. On April 29, 1985, Comer wrote to Slaughter about the request from Edwards setting forth his conclusion that the requested information was "irrelevant and unrelated to the originally requested audits for the *367 years of 1982 and 1983," and citing cases which he alleged denied the I.R.S. the authority to conduct "fishing expeditions." He also claimed that he had been placed on an I.R.S. "hit list," and had been classified as an "Illegal Tax Protestor." Edwards contacted Comer on many occasions to arrange times when they could meet to discuss the 1982 and 1983 audit, but they could never seem to find a time when they were mutually available. They did, however, schedule an appointment for July 22, 1985, at Slaughter's office. On June 14, 1985, the I.R.S. issued a summons to Comer with respect to the audit of Financial Freedom Consultants for the periods ending February 28, 1982, 1983, and 1985 and ending February 29, 1984. Comer was to appear at 3204 Buchanan, Grand Rapids, Michigan (Slaughter's office) on July 22, 1985. Although the summons specified 10:00 A.M. as the time for appearance, Edwards was under the impression that Comer had agreed to meet with her at 8:00 A.M. that morning. Comer did not keep the appointment or comply with the summons. When Edwards arrived at 8:00 A.M., no one answered when she rang the bell, although the back door and garage doors were open and there was *368 a car in the garage. She went to a service station to try to call the office, but no one answered the telephone. When she returned at 10:00 A.M., the house and garage were totally closed and no one answered. On July 19, 1985, Comer wrote to Edwards telling her that he was in receipt of her summons but that Slaughter would not be in his office and apparently would not be available until after August 1, 1985. Edwards, however, did not receive the letter before she showed up for this scheduled appointment. On July 23, 1985, Comer filed a Petition to Quash Summons in the U.S. District Court for the Eastern District of Michigan, Northern Division, against Edwards in an attempt to quash her summons. The I.R.S. wrote to the Department of Justice asking that the case be dismissed because it was not a summons subject to petition to quash. The case was subsequently dismissed. Although she reviewed the Trust amendments, Edwards did not review the Trust documents themselves because Comer told her that he had provided them in previous audits and did not want to make copies for her. On February 4, 1986, Comer wrote to Edwards and Satko asking that notices of deficiency be issued for *369 the years 1982 and 1983 so that they could be combined with the cases pending in this Court for 1981. On March 11, 1986, notices of deficiency were issued to Financial Freedom Consultants for the taxable year ended February 28, 1983, and to the Comers, T.R.Y.E., the American Way Trust, and the Comer Family Trust for the taxable year 1982. As was true for the 1981 notices, they allocated the income and verifiable expenses of the Trusts to the Comers, and taxed the Trusts as corporations. In addition, the notice of deficiency issued to the Comers determined that their income should be increased because of certain items which they or the Trusts had not reported (e.g., miscellaneous income from the sale of coins and farm income from the sale of cattle), and determined that they should be allowed deductions which they had not claimed, e.g., for contributions. The notices of deficiency issued to the Trusts also increased their income for certain unreported items and disallowed certain (but not all) deductions for lack of substantiation or business purpose. Because Comer had provided no records relating to Financial Freedom Consultants, all of its claimed business expenses were disallowed. *370 The notices were based upon a thorough analysis of the records that had been provided, and were issued as alternative positions in order to preserve the Trust-level issues, as had been the case for 1981. On March 24, 1986, Comer wrote on the back of each of the statutory notices of deficiency mailed on March 11, 1986, stating, I have just returned after being away for one week on business and find this unbelievable and completely erroneous notice of tax deficiency awaiting us. After discussing this with the Trustees and their accountant, we would like to schedule an Appellate Conference (an Appeal) as soon as possible and definitely in time so that we can still file in U.S. Tax Court within the proscribed 90 days if these issues can not be resolved at the Appellate level.
Comer, however, did not attempt to determine what procedures the I.R.S. followed with respect to the granting of appellate hearings in cases were the statutory notices of deficiency had been issued but the taxpayers had not filed a petition in this Court. On March 27, 1986, Richard Dakesian (Dakesian), a Reviewer for the I.R.S., wrote to Comer that Comer's only alternative was to *371 file a petition to the U.S. Tax Court within the 90-day period. On May 6, 1986, petitioners filed their petition in the Tax Court in the case at No. 13793-86 with respect to these notices. On May 30, 1986, Comer wrote to Dakesian and Edwards asking that 30-day letters be issued for the Comers, the Comer Family Trust, the American Way Trust, for the taxable year 1983 and Financial Freedom Consultants for the taxable year ended February 29, 1984. Comer made this request in order to combine the 1982 and 1983 returns for Appeals consideration without having to file a petition in this Court with respect to the 1983 years. On June 4, 1986, Dakesian wrote to Comer agreeing to associate the two case files. He also indicated that Comer would be mailed a 30-day letter for the 1983 audits and would have to file a written protest. Dakesian informed Comer that, in order for his request to be honored, Comer would also have to extend the period of limitations for the 1983 years because the 1983 audit had not been completed, and thus more time would be required to associate it with the 1982 files. On June 23, 1986, Edwards sent to Comer, as tax matters partner, a notice that the I.R.S. was *372 beginning a partnership examination of another entity, the Burica Development Company, for 1983 and 1984. Edwards attached to the notice an Information Document Request for various items, including a copy of the partnership agreement, information returns of the partnership (Forms 1065), and partnership books and records. On June 27, 1986, Comer responded to Edwards' request to begin an audit for Burica Development Company for 1983 and 1984. The pertinent parts of the letter provide: Mrs. Edwards, just how long are we going to pursue this little charade? Just how long * * * do you intend to follow the conspiratorial guidelines and false ideologies of Agents Clifford Adamson and Daniel Balogh, in conjunction with your supervisor, Artes Prewitt? I've enclosed a copy of I.R.C. Section 7214 of the 1954 Internal Revenue Code, as amended, for your study. As you can see, "any officer or employee of the United States acting in connection with any revenue law" "who is guilty of any extortion", or "who knowingly demands other or greater sums that [sic] are authorized by law" or "who makes or signs any fraudulent entry in any book, or makes or signs *373 any fraudulent certificate, return, or statement" is guilty of a CRIMINAL OFFENSE, punishable by "dismiss(al) from office or discharged [sic] from employment and, upon conviction thereof, shall be fined not more than $ 10,000, or imprisoned not more than 5 years, or both" with the court rendering "judgment against the said officer or employee for the amount of the damages sustained in favor of the party injured, to be collected by execution." As I should think you would be aware, the Courts have consistently sustained the provisions of I.R.C. Section 7214. * * * as of yet you have not even completed the audits for the year of 1983, commenced fifteen (15) months ago, of WILLIAM L. COMER and MYRA L. COMER, the WILLIAM L. COMER FAMILY EQUITY PURE TRUST, or the AMERICAN WAY TRUST. And, as you can see, neither the District Counsel or the Court is going to accept the incorrect and false audit reports which you yourself submitted for * * * 1982. * * * In addition, you and your associates have failed to even complete the audit of the OSA DEVELOPMENT COMPANY * * *. But, we really know what's going on don't we? Your office doesn't really care nor intend *374 to file complete and proper audit reports anyway do they? If they did that it would be totally contrary to the conspiratorial policy they've established quite some time ago, wouldn't it? * * * As is also obvious, it was your office, no one else, which decided to audit the BURICA DEVELOPMENT and your excuse that you really didn't know "how this happened" or "how" you got the BURICA "audit" is totally false as you well know. Do you really believe that I'm that stupid and naive after all that you people have attempted to do to destroy me financially? Such actions, in case you haven't been so informed, are in direct violation of my Statutory, Civil, and Constitutional Rights -- even more so if they continue.
* * * Now, in face of all the foregoing, I find it incomprehensible, as well as totally unacceptable, that you would request an audit for 1983 and 1984 for BURICA DEVELOPMENT COMPANY when you have failed to complete all of the foregoing discussed audits, particularly after being requested to do so by Mr. Dakesian. * * * Therefore, I will not be available to begin anything else, including the BURICA audit, until you have completed the four (4) *375 audits you've already commenced and done so in a manner commensurate with the agreement for 1981.
On August 19, 1986, Thomas H. Dolce (Dolce), an I.R.S. Appeals Officer in the Detroit Office, wrote to Comer saying that the 1982 case, at docket No. 13793-86, had been referred to that office, scheduling a conference for October 3, 1986, and attaching a copy of Rev. Proc. 82-42, 1982-2 C.B. 761. On September 22, 1986, Comer sent a lengthy letter to Dolce about the scheduled meeting concluding that Nothing further should be necessary on the part of the taxpayers to substantiate their legal and tax position. In this respect, bar anything out of the ordinary, etc., agreement was reached between taxpayer's Counsel, Frank C. Hider, Jr. and District Counsel, Margaret A. Satko, that the year of 1982 would be handled in the same manner as that of 1981.
Comer did, however, meet with Dolce on October 3, 1986. At that time, he supplied Dolce with copies of Trust instruments for review. On September 30, 1986, the 1983 case was reassigned from Edwards to Fred Bullock (Bullock). The purpose of the reassignment was to expedite the completion *376 of the 1983 audit. Because of a 2-month computer training class, Bullock was not able to begin working on the audit immediately. On October 4, 1986, Comer wrote a lengthy letter to Dolce about Financial Freedom Consultants' taxable year ended February 28, 1983. Comer also enclosed certain documents requested by Dolce at their meetings October 3 and 4, 1986, and noted their meeting scheduled for October 27, 1986. On November 6, 1986, John O. Hummell, I.R.S. District Director, wrote to Comer requesting that he extend the period of limitations with respect to the Comers' joint Federal income tax return for the taxable year 1983. In his letter to Comer dated December 10, 1986, Bullock thanked the Comers for extending the period of limitations for the Comers' joint Federal income tax return and the fiduciary income tax returns for the Comer Family Trust and the American Way Trust for the taxable year 1983 and for Financial Freedom Consultants for the taxable year ended February 29, 1984. Bullock also asked Comer to contact him within 10 days to schedule an examination of the returns at Comer's place of business. On December 18, 1986, Comer called Bullock and told him that he was *377 presently working with several other agents and asked Bullock to put the exam on hold. Subsequently, however, Bullock and Comer scheduled an examination to begin on January 20, 1987, at Comer's residence. Bullock, by Information Document Request dated January 5, 1987, asked for information needed to commence examination of the Comers, the Comer Family Trust, and the American Way Trust for the taxable year 1983 and Financial Freedom Consultants for the taxable year ended February 29, 1984, including copies of returns for subsequent years, 1984 and 1985, copies of bank statements, journals, and ledgers. Comer sent a letter to Bullock on January 15, 1987, cancelling the meeting because the Court of Appeals for the Sixth Circuit had requested that Comer redo his index of documents submitted to them. Comer did not attempt to contact Bullock by telephone. That letter did not arrive before Bullock left for the meeting. Bullock's office was closed for the Martin Luther King holiday on Monday, January 19, 1987, and Bullock drove directly from his home to the scheduled meeting the next morning. While stopping off at the Mt. Pleasant I.R.S. office, Bullock was informed about the letter. *378 Bullock was unable to meet with Comer and complete his audit before the expiration of the period of limitations and thus was required to write up his report for issuance of the statutory notices of deficiency. In his letter dated January 7, 1987, entitled "Complaint and Request for Administrative Action," to John J. Wilson (Wilson), Chief, Examination Division, Comer complains: Although it was specifically agreed between Complainant [Comer], Complainant's attorney, Mr. Frank C. Hider, Jr., and District Counsel Margaret A. Satko, that, based upon verification of our income and expenditures in essence, the income tax years of 1982 and 1983 were to be settled in the same manner as that of 1981 for Complainant and the related Irrevocable Trusts. However, with witnesses, we have subsequently learned that Supervisors Artes Prewitt, of the Lansing, Michigan office, and Walter Andrews, of the Detroit, Michigan office, have ORDERED the Revenue Agents to ignore this agreement and to proceed with audits as if such agreement, and the STIPULATED AGREEMENTS dated May 27th and 28th, 1986, [Stipulated Decisions in 1981 cases] do not exist.
On January 8, 1987, Comer wrote *379 to Dolce enclosing copies of the four Trust agreements and confirming their appointment on February 25, 1987, to "finalize the year of 1982, and possibly 1983." On January 22, 1987, petitioners were notified that their case at docket No. 13793-86 was set for trial beginning June 22, 1987, in Detroit, Michigan. All proceedings in this case were stayed when petitioners and the Trusts filed for bankruptcy on February 23, 1987. On January 23, 1987, Comer wrote to Wilson explaining why Comer had cancelled his meeting with Bullock scheduled for January 20, 1987, and asking that the audits for 1983 be reassigned to Edwards. Wilson responded by letter dated February 12, 1987, to Comer's letters of January 7 and 23, 1987, as follows: A discussion with District Counsel Margaret Satko revealed no agreement of the type described in your January 7, 1987, letter was ever made. Therefore, since each year stands on its own merits, the 1982 and 1983 examinations will continue. Your allegations of misrepresentation by members of the IRS concerning the 1981 examination are unfounded. When extensions were not granted, statutory notices were issued to protect the government's interest. You *380 provided books and records only after these notices were issued. Revenue Agent Fred Bullock was reassigned this case. A discussion with Mr. Bullock and Group Manager Artis Pruitt revealed that both individuals acted properly in their dealings with you. Since Mr. Bullock is very familiar with the case, it is not in the government's best interest to transfer the case to another revenue agent. Therefore, your request for transfer to our Traverse City Office and a new revenue agent will not be honored.
On January 29, 1987, Bullock wrote to Comer suggesting that the examination of the 1983 years begin no later than March 2, 1987. Bullock noted that Edwards was scheduled to be in Comer's office March 2-6, 1987, to examine the returns of the partnerships which Comer had organized, and that he (Bullock) could conduct his examination at the same time. Bullock quoted from Comer's letter to Edwards of June 27, 1986, where Comer complained about her delay in completing the 1983 audit, and stated that "I am sure it is still your position to get the examination of the trusts and your individual return completed as soon as possible; therefore, it is my intent to commence *381 the examination on Monday March 2, 1987." By Notice of Seizure dated February 12, 1987, the I.R.S. seized property (vendee's interest in a land contract dated December 1, 1978) from Comer because of nonpayment of past due Internal Revenue taxes. On February 16, 1987, Great Lakes Federal Savings notified Comer that On February 12, 1987, Great Lakes Federal Savings was served with five Notices of Levy regarding your alleged tax liability to the IRS. The Levies were for $ 250,365.10 each and require us to immediately levy upon all savings accounts which carry the names of William L. Comer Family Equity Pure Trust, OSA Development Co., Burica Development Co., American Way Trust and Freedom Financial Consultants, as account holders as well as all accounts identified by your social security number. We are required to remit the above sum to the IRS. * * *
In his letter dated February 17, 1987, Comer disagreed with Wilson's refusal to reassign the audits. Comer concluded his letter, as follows: While we have been attempting for six (6) months to finalize said 1983 audits, and have tentatively scheduled such audits by R. A. Doris Edwards during the week of Feb. *382 23rd or Mar. 2nd, due to the total unreasonableness in attitude and actions of Mr. Pruitt and Mr. Bullock as provided under I.R.C. 7605(a) we will not schedule such audits with them and further subject ourselves to false accusations, misrepresentations nor be subjected to further humiliating, demeaning and hostile attitudes and manners.
On February 18, 1987, Bullock again wrote to Comer confirming the scheduled examination beginning March 2, 1987. Bullock indicated that Edwards would be in Comer's office at the same time to examine the partnerships. Comer responded in his letter of February 24, 1987, by stating: The enclosed Forms 872-T, on behalf of the pertinent parties, should be self-explanatory as to the respective Terminations.
* * * While taxpayers have requested on numerous occasions that the audits be conducted as soon as possible by responsible parties, particularly that by R. A. Doris Edwards, who has complete familiarity with the subject taxpayers having conducted the 1982 audits, they have been continuously denied this opportunity. Instead, it is insisted that such audits be conducted by openly hostile and unreasonable *383 individuals, such audits being merely a "showcase" arrangement whereby the outcomes have already been pre-determined, under the direct orders of Manager Pruitt, to result in deficiencies against the taxpayers to the maximum extent possible. Because of such attitudes, the taxpayers refuse to participate in such an unreasonable, harassing atmosphere or to subject themselves to further antagonism and humiliation. Therefore, the taxpayers will not be part of nor participate in the so-called audits scheduled by * * * Pruitt and Bullock for the date of March 2, 1987, nor, at any other time.
In sending 872-T's, Comer terminated the extension of the period of limitations for the audit as to the joint and trusts returns for the taxable year 1983. Bullock, therefore, had to write up his report for the issuance of statutory notices of deficiency. Comer's action also made it impossible for the I.R.S. to carry out Dakesian's agreement to associate the 1982 and 1983 case files for appellate review because there was no longer sufficient time to complete the 1983 audit prior to the expiration of the period of limitations. On March 2, 1987, Wilson wrote to Comer, reiterating his *384 position as to his denial of Comer's request for reassignment of the audits. On March 13, 1987, Comer wrote to Satko making a formal request for a Stipulation Conference for the 1982 income tax years. The case was continued from the June 22, 1987, Detroit session because of petitioners' bankruptcy filing. On May 19, 1987, statutory notices of deficiency were issued to the Comers, the Comer Family Trust, and the American Way Trust for the taxable year 1983 and to Financial Freedom Consultants for the taxable year ended February 29, 1984. The notice issued to the Comers allocated to them all of the gross income of the Trusts on a grantor/sham trust theory, but allowed none of the deductions which the Trusts claimed based upon lack of substantiation. With respect to Financial Freedom Consultants, the Comers were allocated as income the total of that Trust's bank deposits for calendar 1983. The notices issued to the Trusts treated them as trusts rather than corporations, but disallowed all of their deductions (except for distributions to beneficiaries) and credits. The $ 39,500.00 distribution deduction, which Financial Freedom Consultants claimed, however, was disallowed, because *385 the return stated that the amount of income required to be distributed was zero, and the Schedules K-1 reporting the beneficiaries' share of income was omitted. Bullock prepared the notices in this manner because the period of limitations was due to expire shortly due to Comer's termination of the consents and because of Bullock's inability to meet with Comer. Bullock did not have time to make an extensive review of the records and workpapers which Edwards had obtained and prepared. Petitioners filed their petition with respect to these notices on July 30, 1987, (docket No. 25767-87) and filed a Motion to Calendar on November 30, 1987. In a letter dated December 17, 1987, Dolce wrote to Comer indicating that the case at No. 25767-87 had been referred to the Detroit Appeals Office and scheduling a conference on February 8, 1988, in Traverse City, Michigan. James Scrivener (Scrivener) and Dolce met with Comer on February 8, 1988, at which time Scrivener spent the better part of 3 days copying documents supplied by Comer. Comer told Dolce to contact him if he had any questions with respect to the copied documents. After the meeting in Traverse City, Dolce returned to Grand Rapids *386 where he went over the copied documents and prepared spread sheets. After reviewing the records, Dolce did not contact Comer because the adjustments that were made were in Comer's favor and Dolce did not feel that Comer would, therefore, have any objections. Comer and his attorneys, C. Richard Abbott (Abbott) and Jay A. Kennedy (Kennedy), met with Satko and Dolce several times to discuss settlement of the 1982 and 1983 cases. The cases were eventually settled on the same basis as the Comer's previous ones -- i.e., by collapsing the Trusts' income and verifiable deductions onto the Comers' individual return. The settlement was quite generous to the Comers. Satko allowed the Comers to deduct the Trusts' distributions to beneficiaries which, when collapsed onto their individual return, was nothing more than a deduction for gifts to their children. Other deductions were allowed which Comer did not fully substantiate. One reason that she was so generous was that the I.R.S. already had substantial uncollected assessments against Comer, his bank accounts and other assets had been levied on, and there were no assets left to satisfy the debt. Stipulations of Settlement reflecting *387 the terms of the settlement reached by Comer, his attorney, and Satko were filed on June 13, 1988, in these cases. Pursuant to these settlements, there is a deficiency in the Comers' Federal income tax for 1982 and 1983 of $ 454.50 and $ 9,679.95, respectively. There are no additions to their Federal income tax for either year. There are no deficiencies in or additions to tax to the Trusts' Federal income tax for either year. Even though the notices issued to the Comers and the Trusts were inconsistent in that they taxed the same income to both the Trusts and the Comers, Comer was always aware that the income would ultimately be taxed only once. OPINION On June 4, 1986, the Court received petitioners' original motion for litigation costs in the cases at docket Nos. 16793-85, 16821-85, 16825-85, and 16826-85, after we had entered decisions in these cases on May 27 and 28, 1986. By order dated June 19, 1986, we returned the motion and accompanying documents to them on the grounds that the motion was untimely, having been filed after the decisions were entered, and that there was no evidence that respondent acted unreasonably after the petitions were filed. We reiterated our *388 position that only actions occurring after that time are to be considered in determining whether the position of the United States was unreasonable. Baker v. Commissioner, 83 T.C. 822 (1984), vacated and remanded on other issues 787 F.2d 637 (D.C. Cir. 1986). The Court of Appeals for the Sixth Circuit reversed our order and remanded the case for further consideration. Comer v. Commissioner, 856 F.2d 775 (6th Cir. 1988).With respect to the first ground for dismissing petitioners' motion, the court held that neither section 7430 nor Rule 231 required motions for litigation costs to be filed prior to entry of decision. With respect to our second ground, the court, adopting the position of the First, Fifth, and Ninth Circuit Courts of Appeals, held that actions antedating the petition must be considered in determining the reasonableness of the position of the United States and remanded the cases to us for this inquiry. Petitioners also filed a motion for litigation costs in the cases at Nos. 13793-86 and 25767-87 on June 21, 1988, shortly after we had filed Stipulations of Settlement in the cases on June 13, 1988. Respondent filed *389 an objection to this motion on September 20, 1988. On February 1, 1989, the 1985, 1986, and 1987 cases were consolidated and petitioners were ordered to file new motions for litigation costs in the 1985 cases consistent with the decision of the Sixth Circuit, which they did on February 23, 1989. On February 27, 1989, petitioners filed a motion for sanctions, based upon allegedly false statements in respondent's September 20, 1988, objection to petitioners' June 21, 1988, motion for litigation costs in the 1986 and 1987 cases. In their motion for sanctions, petitioners seek to recover from respondent their costs of defending their June 21, 1988 motion. We held a hearing on all of these motions in Detroit on April 3-4, 1989. We will separately address the motions for litigation costs and the motion for sanctions. Motions for Litigation Costs
Section 7430 permits the award to a taxpayer of reasonable litigation costs in any civil proceeding in a court of the United States brought by or against the United States in connection with the determination, collection, or refund of any tax, interest, or penalty. Section 7430(a). Costs may be awarded only if the taxpayer is the *390 "prevailing party" and has exhausted the administrative remedies available to him within the Internal Revenue Service. Sec. 7430(a) and (b)(1). For civil proceedings commenced before 1986, a taxpayer is considered a "prevailing party" only if: (1) he establishes that the position of the United States in the civil proceeding was unreasonable, and (2) has substantially prevailed with respect to (a) the amount in controversy, or (b) the most significant issue or set of issues presented.
Sec. 7430(c)(2)(A). For these proceedings, the term "position of the United States" is not defined. For civil proceedings commenced after 1985 and before November 11, 1988, a taxpayer is considered a "prevailing party" only if he: (1) establishes that the position of the United States in the civil proceeding was not substantially justified, (2) has substantially prevailed with respect to (a) the amount in controversy, or (b) the most significant issue or set of issues presented, and
(3) had a net worth not exceeding $ 2 million at the time the proceeding was commenced. Sec. 7430(c)(2)(A), as amended by sec. 1551(d) of the Tax Reform Act of 1986, Pub. *391 L. 99-514, 100 Stat. 2085, 2752-2753. For such proceedings, section 7430(c)(4) defines "position of the United States" as (A) the position taken by the United States in the civil proceeding, and (B) any administrative action or inaction by the District Counsel of the Internal Revenue Service (and all subsequent administrative action or inaction) upon which such proceeding is based. With respect to actions commenced prior to 1986, we held, in Baker v. Commissioner, supra, that the United States does not take a "position" in a "civil proceeding" until after the proceeding has commenced which, in this Court, is when a petition is filed. Baker v. Commissioner, supra at 827; Rule 20(a). The Courts of Appeals for the Eighth, Tenth, Eleventh, and District of Columbia Circuits agree, whereas the Courts of Appeals for the First, Fifth, Sixth, and Ninth Circuits disagree, requiring pre-litigation positions to be examined as well. See Sokol v. Commissioner, 92 T.C. 760, 764 n.8 (1989), and cases cited there. For proceedings commenced after 1985 and before November 11, 1988, i.e., those to which section 7430(c)(4) applies, *392 we reaffirmed this position in Sher v. Commissioner, 89 T.C. 79, 86 & n.11 (1987), affd. 861 F.2d 131 (5th Cir. 1988), holding that pre-petition positions are to be considered only within the limits of section 7430(c)(4)(B). This case also held that the "substantially justified" standard is the same as the "reasonableness" standard of prior law. With respect to the 1985 dockets, the Sixth Circuit Court of Appeals decision in this proceeding requires that we examine the reasonableness of the Commissioner's pre-litigation position, despite our contrary view. But the Sixth Circuit's opinion does not apply to the 1986 and 1987 dockets, and did not involve the language of section 7430(c)(4), as added by the Tax Reform Act of 1986. Hence, our position in Sher v. Commissioner, supra, which did consider the new language, controls. However, applying the Sixth Circuit's holding to the later years does not affect the outcome, so we shall review the Commissioner's pre-litigation position in those proceedings as well. Thus, our inquiry is: were the pre-litigation positions taken by the Commissioner in the consolidated proceedings reasonable? *393 Prior to beginning our analysis, we address a minor point. Respondent agrees that petitioners exhausted their administrative remedies, but contends that they did not "substantially prevail" because the settlements were based on treating the Trusts as shams or grantor trusts, and this was the most significant issue. [5] However, a taxpayer need only substantially prevail with respect to either the most significant issue or set of issues, or with respect to the amount in controversy, and not both. A comparison of the statutory notices with the stipulated decisions clearly demonstrates that petitioners prevailed with respect to the amounts in controversy. We thus reach our determination *394 of reasonableness, and we conclude that the only party to the dreary and muddled scenario which we have sketched in our Findings of Fact who was consistently unreasonable was Comer himself. His behavior ranged from uncooperative and evasive to atrocious. He refused to meet with Revenue Agents to discuss the audits, or to allow them to visit the place of business he listed for every endeavor undertaken by him or the Trusts; he failed to keep appointments which he had made with the agents and, at the last minute, ineffectively communicated his nonattendance, thus causing them to waste considerable time and effort; he refused to comply with summonses; he completely refused to cooperate with Bullock's attempt to complete the 1983 examination, even though he had earlier complained about the delay in completing it, and Bullock had been assigned to it in order to finish it as quickly as possible. He accused Doris Edwards, an experienced and hard-working agent, of committing a Federal offense. It was entirely appropriate for the agents to insist on conducting field audits at the location shown on the returns where all of the business activities were conducted, i.e., 9260 E. Colonville *395 Road. We agree that this constitutes sound business procedure. Paper records, no matter how seemingly authentic, can be easily made to mask reality. Further, by providing only records, such as checks and receipts, but refusing to give testimony explaining the records, Comer was responsible for the statutory notices taking the form they did. The best the agents could do under these conditions was to go through the materials provided, allowing whatever they could determine was deductible, and disallowing the remainder. The 1981 and 1982 statutory notices reflect a great deal of this analysis. The only exception is the 1982 notice disallowing all of Financial Freedom Consultants' expenses. However, this was because Comer refused to provide Edwards any records relating to this trust, supposedly because, in his opinion, it was irrelevant to the 1982 and 1983 audits. However, Edwards was clearly justified in requesting this information. Financial Freedom Consultants paid Comer commissions and management fees, apparently not all of which he reported on the joint return. It leased automobiles from the American Way Trust, and the "office building" at 9260 E. Colonville Road from the *396 Comer Family Trust. Comer well knew all of this -- he was the one who set it up. We thus question the sincerity of his belief, and think it quite likely that it was simply another masquerade for more stalling. Comer contends that Balogh was unreasonable in not issuing a 30-day letter to him after finishing the 1981 report. However, Balogh reasonably believed that he would obtain no further information from Comer. Comer had refused to meet with Balogh at Comer's residence/office building and had ignored Balogh's summonses. When he went to the residence, with the understanding that he would meet with Comer and conduct the examination, Mrs. Comer told him that she had been instructed not to admit him. Comer also complains that he was not permitted an appeals conference with respect to the 1981 and 1982 notices prior to filing a petition in this Court. He claims that, when he wrote the letters to Bonita Hall, it was not his understanding that he had to file a petition in order to have a conference, and that his understanding was based upon the notices. Under questioning from the bench, however, he admitted that the notices did not provide that he could have a pre-petition conference, *397 and that he did not consult any authority on this point. He stated, "No, sir, I wouldn't even know where to find that at that time." The policy in question is set forth in the "Policies of the IRS Handbook" portion of the Internal Revenue Manual, P-8-24, and was approved December 23, 1960. It is reprinted in 1 Internal Revenue Manual -- Administration (CCH) 1305-49. While we agree that, under normal circumstances, it would be difficult for a lay person to locate this authority, Comer quoted extensively from the Internal Revenue Manual, including the "Policies of the IRS Handbook," in his various motions. He thus appears to have some facility at research in this area, and we are not so certain that he could not have come upon the relevant passage had he chosen to look for it. Further, with respect to the 1982 notices, Dakesian wrote Comer a letter advising him of this policy. Finally, after filing the petitions for the 1981 notices, Comer refused the opportunity which Tharpe offered him for an appeals conference on these cases. Instead, he sent Tharpe a curt letter accusing him and his superiors of covering up a crime. The 1983 notices do not reflect any substantial analysis *398 of records -- all deductions were disallowed in "boxcar" fashion. However, this was again mainly due to Comer's obstinate refusal to meet with Bullock to permit him to complete the examination. It is true that Edwards was more familiar with Comer's situation. However, in large part due to Comer's evasive tactics, e.g., the refusal to comply with the summons for Financial Freedom Consultants, and the "missed" July 22, 1985, appointment, by the fall of 1986, she had not finished her report, Comer had been complaining bitterly about the delay, and Bullock had a reputation for moving things along. Bullock was thus assigned the audit in the good faith belief that he would conclude it expeditiously. Unfortunately, Bullock encountered the same stonewalling from Comer that had plagued Edwards and never saw Comer until the hearing in these proceedings in April 1989. Bullock drafted the 1983 notices in this fashion because Comer terminated the consents and Bullock therefore did not have time to go through the files in any detail. Bullock had diligently attempted to arrange a meeting with Comer for more than 2 months. Comer also complains at length about the double and triple taxation *399 inflicted by the notices. However, historical experience belies the genuineness of this grievance. By the time he received the 1981 notices in March 1985, Comer was an old hand at the audit game. He and his trusts had been audited for every year from 1975 through 1980. Comer was always aware that he would ultimately only be taxed once, and, as he well knew, this was the outcome of all of the numerous settlement agreements that he and Satko participated in. The Trusts' income and allowable expenses were treated as his own, and no separate tax was assessed against the Trusts. It has long been established that the Commissioner may issue inconsistent notices of deficiency taxing the same income to different taxpayers in order to protect the revenue. Nat Harrison Associates, Inc. v. Commissioner, 42 T.C. 601, 617 (1964).Such action is especially appropriate when the I.R.S. has been unable to ascertain all of the facts. Comer claims that he was "betrayed" by the issuance of the 1983 notices. It is true that Dakesian agreed to associate the 1982 and 1983 case files for appellate consideration upon completion of the 1983 examination, but he expressly conditioned his *400 agreement on Comer's keeping the period of limitations open for the 1983 returns. However, Comer not only refused to cooperate in completing the 1983 examination, but terminated the 1983 consents as well, thus making issuance of the notices inevitable. Finally, we have noticed what appear to be a number of discrepancies and unusual situations in the Comers' and the Trusts' returns. Certain of the Trusts deducted distributions to beneficiaries which were not reported on the latter's returns; the Comer Family Trust deducted depreciation with respect to the Comer residence, although clearly much of it was used for personal purposes, and claimed depreciation on an Appaloosa stallion; T.R.Y.E. claimed depreciation on a chain saw, although the relevant business activity was listed as "books"; both the Comer Family Trust and T.R.Y.E. listed the Comer's residence on E. Colonville Road as the addresses of their farms, but no farm operations were conducted there; the Comer Family Trust's 1982 return indicated that the real property at 9260 E. Colonville Road was sold in May 1982, but this property was listed as the Trusts' address not only when the 1982 returns were filed in 1983, but when *401 the 1983 returns were filed in 1984 as well. It is thus understandable that the agents had many questions, and wanted to ask Comer about them. The record shows that when he eventually did what the agents originally asked him to do, i.e., provide testimony and review the records with them, most of his expenses were allowed. However, Comer did this only in the context of settlement conferences with District Counsel, after the statutory notices had been issued and petitions filed. Had he cooperated initially, none of that would have been necessary or, in our view, would have happened. Comer is the author of his own misfortune and is entitled to no litigation costs whatsoever. Motion for Sanctions
The pertinent part of Rule 33(b) provides: The signature of counsel * * * constitutes a certificate by him that he has read the pleading, that, to the best of his knowledge, information, and belief formed after reasonable inquiry, it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay *402 or needless increase in the cost of litigation * * *. If a pleading is signed in violation of this Rule, the Court * * * may impose * * * an appropriate sanction, which may include an order to pay to the other party * * * the amount of the reasonable expenses incurred because of the filing of the pleading, including reasonable counsel's fees.
Based upon Margaret Satko's testimony and a review of the relevant pleadings, we are convinced that she did not violate Rule 33(b) in signing the September 20, 1988, objection. Thus, the motion will be denied. To reflect the foregoing,
An appropriate order will be issued. Footnotes
1. Cases of the following petitioners are consolidated herewith: William L. Comer and Myra L. Comer, docket No. 16821-85; T.R.Y.E.-A Trust, William L. Comer, Trustee, docket No. 16825-85; American Way Trust, Myra L. Comer, Trustee, docket No. 16826-85; William L. Comer and Myra L. Comer, William L. Comer Family Equity Pure Trust, William L. Comer, Trustee, American Way Trust, William L. Comer, Trustee, T.R.Y.E.-A Trust, William L. Comer, Trustee, and Financial Freedom Consultants, William L. Comer, Trustee, docket No. 13793-86; William L. Comer and Myra L. Comer, William L. Comer Family Equity Pure Trust, Myra L. Comer, Trustee and William L. Comer as Attorney in Fact, American Way Trust, Myra L. Comer, Trustee and William L. Comer as Attorney in Fact, and Financial Freedom Consultants, William L. Comer, Trustee, docket No. 25767-87.↩
2. Unless otherwise indicated, all section numbers refer to the Internal Revenue Code in effect for the taxable years 1981, 1982, and 1983, and rule numbers refer to the Rules of Practice and Procedure of this Court.↩
*. 50 percent of the interest due on the entire deficiencies in income taxes.↩
3. When used in the singular, Comer refers to petitioner William L. Comer.↩
4. Gudenschwager v. Commissioner, T.C. Memo. 1980-439; Wesel v. Commissioner, T.C. Memo. 1980-438↩.
5. The United States District Court for the Eastern District of Michigan found that the Trusts were in fact shams for purposes of Michigan law, and hence disregarded all transactions between the Comers and the Trusts. William L. Comer Family Equity Trust v. United States, 732 F. Supp. 755↩ (E.D. Mich. 1990).